[909 NE2d 1195, 882 NYS2d 357]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v SCOTT C. WEAVER, Appellant.

Argued March 24, 2009; decided May 12, 2009

**POINTS OF COUNSEL**

*Smith Hernandez LLC,* Troy (*Trey Smith* and *Matthew C. Hug* of counsel), for appellant. I. County Court erred reversibly in failing to suppress GPS evidence obtained by the police without a warrant. (*United States v Knotts,* 460 US 276; *Katz v United States,* 389 US 347; *Lopez v United States,* 373 US 427; *Olmstead v United States,* 277 US 438; *Smith v Maryland,* 442 US 735; *People v Guerra,* 65 NY2d 60; *United States v Karo,* 468 US 705; *United States v Garcia,* 474 F3d 994; *New York v Class,* 475 US 106; *People v Hall,* 10 NY3d 303.) II. Supreme Court erred in failing to instruct the jury that Amber Roche was an accomplice as a matter of law to the K-Mart burglary. (*People v Berger,* 52 NY2d 214; *People v Cohen,* 73 AD2d 603; *People v Cona,* 49 NY2d 26; *People v Rugg,* 91 AD2d 692; *People v Bell,* 32 AD2d 781.) III. Alternatively, Supreme Court erred in failing to submit to the jury the issue of whether Amber Roche was an accomplice to the K-Mart burglary. (*People v Caban,* 5 NY3d 143; *People v Dorta,* 46 NY2d 818; *People v Prude,* 2 AD3d 1318, 3 NY3d 646; *People v Durham,* 248 AD2d 820, 91 NY2d 972; *People v O'Malley,* 236 AD2d 736; *People v Gjonaj,* 179 AD2d 773, 79 NY2d 947; *People v DeMatteis,* 186 AD2d 460, 81 NY2d 787; *People v Tutora,* 42 AD2d 952.) IV. Supreme Court erred in permitting evidence of alleged witness tampering by defendant. (*People v Bennett,* 79 NY2d 464; *People v Reddy,* 261 NY 479; *People v Moses,* 63 NY2d 299; *People v Alexander,* 37 NY2d 202; *People v Shilitano,* 218 NY 161; *People v Yazum,* 13 NY2d 302; *People v Leyra,* 1 NY2d 199; *People v Lewis,* 69 NY2d 321; *People v Jackson,* 218 AD2d 556; *People v Harper,* 75 NY2d 313.) V. The evidence was insufficient as a matter of law to sustain the convictions. (*People v Moses,* 63 NY2d 299.)

*P. David Soares, District Attorney,* Albany (*Christopher D. Horn* of counsel), for respondent. I. Placing a GPS device on the undercarriage of a vehicle without a warrant does not violate the Fourth Amendment or article I, § 12 of the New York Constitution. (*Katz v United States,* 389 US 347; *Lewis v United States,* 385 US 206; *United States v Miller,* 425 US 435; *Cardwell v Lewis,* 417 US 583; *United States v Knotts,* 460 US 276; *Kyllo v United States,* 533 US 27; *Vernonia School Dist. 47J v Acton,* 515 US 646; *United States v Moran,* 349 F Supp 2d 425; *New York v Class,* 475 US 106; *United States v Rascon-Ortiz,* 994 F2d 749.) II. Supreme Court properly rejected defendant's request for an accomplice instruction. (*People v Caban,* 5 NY3d 143; *People v Besser,* 96 NY2d 136; *People v Cobos,* 57 NY2d 798; *People v Basch,* 36 NY2d 154; *People v Torello,* 94 AD2d 857; *People v Faulkner,* 36 AD3d 951.) III. Supreme Court properly rejected defendant's request to submit to the jury the issue of whether Amber Roche was an accomplice. (*People v Basch,* 36 NY2d 154; *People v Sweet,* 78 NY2d 263.) IV. Supreme Court properly admitted testimony regarding witness tampering. (*People v De Perno,* 101 AD2d 1003; *People v Shilitano,* 218 NY 161; *People v Bennett,* 79 NY2d 464; *People v Yazum,* 13 NY2d 302; *People v Leyra,* 1 NY2d 199; *People v Crimmins,* 36 NY2d 230.) V. The verdict was based upon legally sufficient evidence. (*People v Craft,* 36 AD3d 1145; *People v Parker,* 29 AD3d 1161, 7 NY3d 907; *People v Contes,* 60 NY2d 620; *Jackson v Virginia,* 443 US 307; *People v Ficarrota,* 91 NY2d 244; *People v Cabey,* 85 NY2d 417; *People v Bleakley,* 69 NY2d 490.)

*Moskowitz, Book & Walsh, LLP,* New York City (*Susan J. Walsh* of counsel), *Norman L. Reimer,* Washington, D.C., *Ivan J. Dominguez, Green & Willstatter,* White Plains (*Richard D. Willstatter* of counsel), *Lee Tien,* San Francisco, California, *Rajdeep Singh Jolly,* Washington, D.C., *Alfred O'Connor,* Albany, *Arnold & Porter LLP,* Washington, D.C. (*Stephen M. Sacks* of counsel), *Abed A. Ayoub,* and *Nadhira F. Al-Khalili* for National Association of Criminal Defense Lawyers and others, amici curiae. This Court should hold that surreptitious implantation of a GPS monitoring device in an individual's vehicle by law enforcement and around-the-clock electronic tracking and recording of movements without spatial or temporal limitation is impermissible, absent a warrant based upon probable cause. (*United States v Knotts,* 460 US 276; *United States v Jacobsen,* 466 US 109; *Olmstead v United States,* 277 US 438; *Katz v United States,* 389 US 347; *United States v Karo,* 468 US 705; *Bond v United States,* 529 US 334; *United States v Berry,* 300 F Supp 2d 366; *United*

*States v Garcia,* 474 F3d 994; *United States v Moran,* 349 F Supp 2d 425; *People v Gant,* 9 Misc 3d 611.)

*Christopher Dunn,* New York City, *Arthur Eisenberg* and *Palyn Hung* for New York Civil Liberties Union, amicus curiae. I. The highest courts of two other states have held that their state constitutions require police to obtain a warrant before engaging in electronic tracking. II. Defendant's state constitutional claim is not controlled by Fourth Amendment "reasonable expectation of privacy" doctrine. (*People v Class,* 63 NY2d 491, 475 US 106, 67 NY2d 431.) III. The Court should hold that electronic police tracking of private vehicles requires a warrant. (*People v Class,* 63 NY2d 491; *Katz v United States,* 389 US 347; *Olmstead v United States,* 277 US 438.)

## OPINION OF THE COURT

Chief Judge LIPPMAN.

In the early morning hours of December 21, 2005, a State Police Investigator crept underneath defendant's street-parked van and placed a global positioning system (GPS) tracking device inside the bumper. The device remained in place for 65 days, constantly monitoring the position of the van. This nonstop surveillance was conducted without a warrant.

The GPS device, known as a "Q-ball," once attached to the van, operated in conjunction with numerous satellites, from which it received tracking data, to fix the van's location. The Q-ball readings indicated the speed of the van and pinpointed its location within 30 feet. Readings were taken approximately every minute while the vehicle was in motion, but less often when it was stationary. The device's battery required replacement during the monitoring period, which resulted in yet another nocturnal visit by the investigator to the van's undercarriage. To download the location information retrieved by the Q-ball, the investigator would simply drive past the van and press a button on a corresponding receiver unit, causing the tracking history to be transmitted to and saved by a computer in the investigator's vehicle.

It is not clear from the record why defendant was placed under electronic surveillance. What is clear is that he was eventually charged with and tried in a single proceeding for crimes relating to two separate burglaries—one committed in July 2005 at the Latham Meat Market and the other on Christmas Eve of the same year at the Latham K-Mart.

The prosecution sought to have admitted at trial GPS readings showing that, on the evening of the Latham K-Mart

burglary at 7:26, defendant's van traversed the store's parking lot at a speed of six miles per hour. Without a hearing, County Court denied defendant's motion to suppress the GPS data, and the electronic surveillance evidence was received. The additional evidence against defendant came primarily from Amber Roche, who was charged in connection with the Latham Meat Market burglary and was deemed an accomplice in the commission of that burglary.

Roche testified that prior to the date of the burglary, she drove through the parking lot of the Latham K-Mart with defendant and John Scott Chiera, while the men looked for the best place to break into the store. She stated that on the night of the burglary, defendant and Chiera left her apartment wearing dark clothing. When they returned, Chiera's hand was bleeding. Other evidence showed that, during the burglary, a jewelry case inside the K-Mart had been smashed and stained with blood containing DNA matching that of Chiera. Notably, Roche's initial statement to the police did not implicate defendant in the K-Mart burglary, but rather indicated that Chiera had committed the crime with a different individual. A few weeks later, Roche gave the police a second statement implicating defendant instead of that individual.

The jury convicted defendant of two counts relating to the K-Mart burglary, but acquitted him of the counts pertaining to the Meat Market burglary. The ensuing judgment of conviction was affirmed by a divided Appellate Division. The majority rejected defendant's argument that his Fourth Amendment rights had been violated by the warrantless placement and use of the GPS device, and found that he had no greater right to relief under the State Constitution. It premised its decision largely upon what it deemed to be defendant's reduced expectation of privacy in the exterior of his vehicle (52 AD3d 138 [3d Dept 2008]).

One Justice dissented and would have suppressed the evidence obtained from the GPS tracking device. The dissenting opinion agreed that there was no Fourth Amendment violation, but found a violation of defendant's corresponding rights under the State Constitution—stating that citizens "have a reasonable expectation that their every move will not be continuously and indefinitely monitored by a technical device without their knowledge, except where a warrant has been issued based on probable cause" (*id*. at 145). The dissenting Justice granted defendant leave to appeal (10 NY3d 966 [2008]) and we now reverse.

The Fourth Amendment, read literally, protects property and for a long time was read to do no more. In *Olmstead v United States* (277 US 438 [1928]), the Supreme Court, adhering to the notion that a Fourth Amendment infringement was essentially one affecting property,* refused to find that a telephone wiretap was a search within the amendment's meaning because the wiretap involved no trespass into the houses or offices of the defendants. Justice Brandeis differed and offered as an alternative to the majority's understanding of the amendment this much more encompassing view:

> "The protection guaranteed by the Amendments [the Fourth and Fifth] is much broader in scope [than the protection of property]. The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the Government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment. And the use, as evidence in a criminal proceeding, of facts ascertained by such intrusion must be deemed a violation of the Fifth" (*id.* at 478-479 [dissenting op]).

Brandeis's dissent was resonant, even in the years immediately after the case's decision. And, some 12 years later, at the New York State Constitutional Convention of 1938, the view that there should be constitutional protection against governmental infringements of privacy not involving any offense against property found vindication in this state's analogue to the Fourth Amendment, only then adopted. Our constitutional

---

* The Court noted: "The Amendment itself shows that the search is to be of material things—the person, the house, his papers or his effects. The description of the warrant necessary to make the proceeding lawful, is that it must specify the place to be searched and the person or *things* to be seized" (277 US at 464).

provision (art I, § 12), in addition to tracking the language of the Fourth Amendment, provides:

"The right of the people to be secure against unreasonable interception of telephone and telegraph communications shall not be violated, and ex parte orders or warrants shall issue only upon oath or affirmation that there is reasonable ground to believe that evidence of crime may be thus obtained, and identifying the particular means of communication, and particularly describing the person or persons whose communications are to be intercepted and the purpose thereof."

On the federal level, however, Brandeis's seminal and eloquent recognition that privacy and not property per se was the essential value protected by the Fourth Amendment was slower to find definitive doctrinal acceptance. Finally, however, in *Katz v United States* (389 US 347, 357 [1967]) the Supreme Court overruled *Olmstead*, holding:

"[T]he underpinnings of *Olmstead* and *Goldman* have been so eroded by our subsequent decisions that the 'trespass' doctrine there enunciated can no longer be regarded as controlling. The Government's activities in electronically listening to and recording the petitioner's words violated the privacy upon which he justifiably relied while using the telephone booth and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment. The fact that the electronic device employed to achieve that end did not happen to penetrate the wall of the booth can have no constitutional significance" (*id.* at 353).

Since *Katz*, the existence of a privacy interest within the Fourth Amendment's protective ambit has been understood to depend upon whether the individual asserting the interest has demonstrated a subjective expectation of privacy and whether that expectation would be accepted as reasonable by society (*see Katz*, 389 US at 361 [Harlan, J., concurring]). However, while *Katz* purported to deemphasize location as a determinant in judging the reach of the Fourth Amendment, the analysis it seemed to require naturally reintroduced considerations of place back into the calculus since the social reasonableness of an individual's expectation of privacy will quite often turn upon the quality of the space inhabited or traversed, i.e., whether it is

public or private space. An individual has been held to have a significantly reduced expectation of privacy when passing along a public way, particularly in a motor vehicle.

The amalgam of issues with which we here deal, arising from the use of a new and potentially doctrine-forcing surveillance technology by government law enforcers to track movements over largely public terrain, was most significantly dealt with by the Supreme Court in the post-*Katz* era in *United States v Knotts* (460 US 276 [1983]). There, government agents placed a beeper in a five-gallon drum of chloroform to track the container's movements. They then followed the vehicle that transported the container using both visual surveillance and a monitor that received signals from the beeper. Although the officers lost sight of the vehicle, it was eventually located at Knotts's cabin. The Court noted that, although Knotts had an expectation of privacy in his cabin, there was no such expectation attending the movements of the vehicle transporting the container (*id.* at 282). "A person traveling in an automobile on public thoroughfares," the Court observed, "has no reasonable expectation of privacy in his [or her] movements from one place to another" (*id.* at 281). This was so, said the Court, because the particular route taken, stops made and ultimate destination are apparent to any member of the public who happens to observe the vehicle's movements (*see id.* at 281-282). The use of the beeper in addition to the visual surveillance did not change the Court's analysis: "Nothing in the Fourth Amendment prohibited the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afforded them in this case" (*id.* at 282).

At first blush, it would appear that *Knotts* does not bode well for Mr. Weaver, for in his case, as in *Knotts*, the surveillance technology was utilized for the purpose of tracking the progress of a vehicle over what may be safely supposed to have been predominantly public roads and, as in *Knotts*, these movements were at least in theory exposed to "anyone who wanted to look" (*id.* at 281). This, however, is where the similarity ends.

*Knotts* involved the use of what we must now, more than a quarter of a century later, recognize to have been a very primitive tracking device. The device was, moreover, used in a focused binary police investigation for the discreet purpose of ascertaining the destination of a particular container of chloroform. And, in this application, during the single trip from the place where the chloroform was purchased to the Knotts cabin, the beeper

was fairly described by the Court as having functioned merely as an enhancing adjunct to the surveilling officers' senses; the officers actively followed the vehicle and used the beeper as a means of maintaining and regaining actual visual contact with it. The technology was, in this context, not unconvincingly analogized by the Court to a searchlight, a marine glass, or a field glass (*id.* at 283, citing *United States v Lee*, 274 US 559, 563 [1927]).

Here, we are not presented with the use of a mere beeper to facilitate visual surveillance during a single trip. GPS is a vastly different and exponentially more sophisticated and powerful technology that is easily and cheaply deployed and has virtually unlimited and remarkably precise tracking capability. With the addition of new GPS satellites, the technology is rapidly improving so that any person or object, such as a car, may be tracked with uncanny accuracy to virtually any interior or exterior location, at any time and regardless of atmospheric conditions. Constant, relentless tracking of anything is now not merely possible but entirely practicable, indeed much more practicable than the surveillance conducted in *Knotts*. GPS is not a mere enhancement of human sensory capacity, it facilitates a new technological perception of the world in which the situation of any object may be followed and exhaustively recorded over, in most cases, a practically unlimited period. The potential for a similar capture of information or "seeing" by law enforcement would require, at a minimum, millions of additional police officers and cameras on every street lamp.

That such a surrogate technological deployment is not— particularly when placed at the unsupervised discretion of agents of the state "engaged in the often competitive enterprise of ferreting out crime" (*Johnson v United States*, 333 US 10, 14 [1948])—compatible with any reasonable notion of personal privacy or ordered liberty would appear to us obvious. One need only consider what the police may learn, practically effortlessly, from planting a single device. The whole of a person's progress through the world, into both public and private spatial spheres, can be charted and recorded over lengthy periods possibly limited only by the need to change the transmitting unit's batteries. Disclosed in the data retrieved from the transmitting unit, nearly instantaneously with the press of a button on the highly portable receiving unit, will be trips the indisputably private nature of which takes little imagination to conjure: trips to the psychiatrist, the plastic surgeon, the abortion clinic, the

AIDS treatment center, the strip club, the criminal defense attorney, the by-the-hour motel, the union meeting, the mosque, synagogue or church, the gay bar and on and on. What the technology yields and records with breathtaking quality and quantity is a highly detailed profile, not simply of where we go, but by easy inference, of our associations—political, religious, amicable and amorous, to name only a few—and of the pattern of our professional and avocational pursuits. When multiple GPS devices are utilized, even more precisely resolved inferences about our activities are possible. And, with GPS becoming an increasingly routine feature in cars and cell phones, it will be possible to tell from the technology with ever increasing precision who we are and are not with, when we are and are not with them, and what we do and do not carry on our persons—to mention just a few of the highly feasible empirical configurations.

*Knotts*, of course, opens by adverting to *Olmstead* and the eventual vindication of the *Olmstead* dissent in *Katz*, and there is every evidence from the decision that the Court was acutely aware of its obligation in the post-*Katz* era to assure, as one court has succinctly (and perhaps disapprovingly) put it, that Fourth Amendment jurisprudence "keep[s] pace with the march of science" (*United States v Garcia*, 474 F3d 994, 997 [7th Cir 2007, Posner, J.]). The science at issue in *Knotts* was, as noted, quite modest, amounting to no more than an incremental improvement over following a car by the unassisted eye (*see id.* at 998). This being so, the Court quite reasonably concluded that the technology *"in this case"* (*Knotts*, 460 US at 282 [emphasis added]) raised no Fourth Amendment issue, but pointedly acknowledged and reserved for another day the question of whether a Fourth Amendment issue would be posed if "twenty-four hour surveillance of any citizen of this country [were] possible, without judicial knowledge or supervision" (*id.* at 283). To say that that day has arrived involves no melodrama; 26 years after *Knotts*, GPS technology, even in its present state of evolution, quite simply and matter-of-factly forces the issue.

It would appear clear to us that the great popularity of GPS technology for its many useful applications may not be taken simply as a massive, undifferentiated concession of personal privacy to agents of the state. Indeed, contemporary technology projects our private activities into public space as never before. Cell technology has moved presumptively private phone conversation from the enclosure of *Katz*'s phone booth to the

open sidewalk and the car, and the advent of portable comput-
ing devices has resituated transactions of all kinds to relatively
public spaces. It is fair to say, and we think consistent with
prevalent social views, that this change in venue has not been
accompanied by any dramatic diminution in the socially reason-
able expectation that our communications and transactions will
remain to a large extent private. Here, particularly, where there
was no voluntary utilization of the tracking technology, and the
technology was surreptitiously installed, there exists no basis to
find an expectation of privacy so diminished as to render
constitutional concerns de minimis.

It is, of course, true that the expectation of privacy has been
deemed diminished in a car upon a public thoroughfare. But, it
is one thing to suppose that the diminished expectation affords
a police officer certain well-circumscribed options for which a
warrant is not required and quite another to suppose that when
we drive or ride in a vehicle our expectations of privacy are so
utterly diminished that we effectively consent to the unsuper-
vised disclosure to law enforcement authorities of all that GPS
technology can and will reveal. Even before the advent of GPS,
it was recognized that a ride in a motor vehicle does not so
completely deprive its occupants of any reasonable expectation
of privacy:

> "An individual operating or traveling in an automo-
> bile does not lose all reasonable expectation of
> privacy simply because the automobile and its use
> are subject to government regulation. Automobile
> travel is a basic, pervasive, and often necessary
> mode of transportation to and from one's home,
> workplace, and leisure activities. Many people spend
> more hours each day traveling in cars than walking
> on the streets. Undoubtedly, many find a greater
> sense of security and privacy in traveling in an
> automobile than they do in exposing themselves by
> pedestrian or other modes of travel. Were the indi-
> vidual subject to unfettered governmental intrusion
> every time he entered an automobile, the security
> guaranteed by the Fourth Amendment would be
> seriously circumscribed. As *Terry v Ohio* . . .
> recognized, people are not shorn of all Fourth
> Amendment protection when they step from their
> homes onto the public sidewalks. Nor are they shorn
> of those interests when they step from the sidewalks

into their automobiles. See *Adams* v. *Williams*, 407 U. S. 143, 146 (1972)" (*Delaware v Prouse*, 440 US 648, 662-663 [1979]).

This view has recently been reaffirmed by the Supreme Court in *Arizona v Gant* (556 US —, 129 S Ct 1710 [2009]), where the Court, in addressing the scope of the search incident to arrest exception to the warrant requirement in the context of a vehicle stop, had occasion to observe, "the State seriously undervalues the privacy interests at stake. Although we have recognized that a motorist's privacy interest in his vehicle is less substantial than in his home . . . the former interest is nevertheless important and deserving of constitutional protection" (556 US at —, 129 S Ct at 1720). And, we, of course, have held in reliance upon our own Constitution that the use of a vehicle upon a public way does not effect a complete surrender of any objectively reasonable, socially acceptable privacy expectation (*People v Class*, 63 NY2d 491, 495 n 3 [1984], *revd* 475 US 106 [1986], *on remand* 67 NY2d 431 [1986] [adhering to determination of state constitutional law]).

The residual privacy expectation defendant retained in his vehicle, while perhaps small, was at least adequate to support his claim of a violation of his constitutional right to be free of unreasonable searches and seizures. The massive invasion of privacy entailed by the prolonged use of the GPS device was inconsistent with even the slightest reasonable expectation of privacy.

While there may and, likely will, be exigent situations in which the requirement of a warrant issued upon probable cause authorizing the use of GPS devices for the purpose of official criminal investigation will be excused, this is not one of them. Plainly, no emergency prompted the attachment of the Q-ball to defendant's van. Indeed, upon this record, it is impossible to discern any reason, apart from hunch or curiosity, for the Q-ball's placement. But even if there were some retrospectively evident reason for the use of the device, it could not validate the search. "Over and again [the Supreme] Court has emphasized that the mandate of the (Fourth) Amendment requires adherence to judicial processes, and that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions" (*Katz*, 389 US at 357 [citations and internal quotation marks omitted]). The placement of the Q-ball and the

ensuing disclosure of defendant's movements over a 65-day period comes within no exception to the warrant requirement, and the People do not contend otherwise. They contend only that no search occurred, a contention that we find untenable.

In reaching this conclusion, we acknowledge that the determinative issue remains open as a matter of federal constitutional law, since the United States Supreme Court has not yet ruled upon whether the use of GPS by the state for the purpose of criminal investigation constitutes a search under the Fourth Amendment, and, indeed, the issue has not yet been addressed by the vast majority of the Federal Circuit Courts. Thus, we do not presume to decide the question as a matter of federal law. The very same principles are, however, dispositive of this matter under our State Constitution. If, as we have found, defendant had a reasonable expectation of privacy that was infringed by the State's placement and monitoring of the Q-ball on his van to track his movements over a period of more than two months, there was a search under article I, § 12 of the State Constitution. And that search was illegal because it was executed without a warrant and without justification under any exception to the warrant requirement. In light of the unsettled state of federal law on the issue, we premise our ruling on our State Constitution alone.

We note that we have on many occasions interpreted our own Constitution to provide greater protections when circumstances warrant and have developed an independent body of state law in the area of search and seizure (*see e.g. People v Scott*, 79 NY2d 474 [1992]; *People v Harris*, 77 NY2d 434 [1991]; *People v Dunn*, 77 NY2d 19 [1990]; *People v Torres*, 74 NY2d 224, 228 [1989]). We have adopted separate standards "when doing so best promotes 'predictability and precision in judicial review of search and seizure cases and the protection of the individual rights of our citizens' " (*People v P.J. Video*, 68 NY2d 296, 304 [1986] [citations omitted]). What we articulate today may or may not ultimately be a separate standard. If it is, we believe the disparity would be justified. The alternative would be to countenance an enormous unsupervised intrusion by the police agencies of government upon personal privacy and, in this modern age where criminal investigation will increasingly be conducted by sophisticated technological means, the consequent marginalization of the State Constitution and judiciary in matters crucial to safeguarding the privacy of our citizens.

At a similar crossroads, Justice Brandeis in *Olmstead* queried, "[c]an it be that the Constitution affords no protection against

such invasions of individual security?'' (277 US at 474.) We today, having understood the lesson of *Olmstead*, reply ''no,'' at least not under our State Constitution. Leaving the matter to the Legislature would be defensible only upon the ground that there had been no intrusion upon defendant's privacy qualifying as an article I, § 12 ''search.'' Nothing prevents the Legislature from acting to regulate the use of GPS devices within constitutional limits, but, we think it manifest that the continuous GPS surveillance and recording by law enforcement authorities of the defendant's every automotive movement cannot be described except as a search of constitutional dimension and consequence.

Contrary to the dissenting views, the gross intrusion at issue is not less cognizable as a search by reason of what the Legislature has or has not done to regulate technological surveillance. Nor does the bare preference for legislatively devised rules and remedies in this area constitute a ground for treating the facts at bar as of subconstitutional import. Before us is a defendant whose movements have, for no apparent reason, been tracked and recorded relentlessly for 65 days. It is quite clear that this would not and, indeed, realistically could not have been done without GPS and that this dragnet use of the technology at the sole discretion of law enforcement authorities to pry into the details of people's daily lives is not consistent with the values at the core of our State Constitution's prohibition against unreasonable searches.

We find persuasive the conclusions of other state courts that have addressed this issue and have held that the warrantless use of a tracking device is inconsistent with the protections guaranteed by their state constitutions (*State v Jackson*, 150 Wash 2d 251, 76 P3d 217 [2003]; *State v Campbell*, 306 Or 157, 759 P2d 1040 [1988]). The corresponding provision of the Washington State Constitution differs from and has been held to be more protective than the Fourth Amendment. However, the court noted that the use of a GPS device was not merely an augmentation of an officer's senses (*see Jackson*, 150 Wash 2d at 261-262, 76 P3d at 223) and that the means of surveillance allowed the government to access an enormous amount of additional information, including a person's associations and activities (*see* 150 Wash 2d at 260, 76 P3d at 222). The court concluded that ''citizens of this State have a right to be free from the type of governmental intrusion that occurs when a GPS device is attached to a citizen's vehicle, regardless of

reduced privacy expectations due to advances in technology" and that a warrant was needed before such a device could be installed (150 Wash 2d at 264, 76 P3d at 224).

Similarly, the Supreme Court of Oregon held that the government's use of a radio transmitter to monitor the location of defendant's car was a search under the State Constitution as it was a significant limitation on the defendant's freedom from scrutiny (*Campbell*, 306 Or at 171, 759 P2d at 1048), and that the warrantless use of the transmitter in the absence of exigent circumstances was "nothing short of a staggering limitation upon personal freedom" (306 Or at 172, 759 P2d at 1049).

Technological advances have produced many valuable tools for law enforcement and, as the years go by, the technology available to aid in the detection of criminal conduct will only become more and more sophisticated. Without judicial oversight, the use of these powerful devices presents a significant and, to our minds, unacceptable risk of abuse. Under our State Constitution, in the absence of exigent circumstances, the installation and use of a GPS device to monitor an individual's whereabouts requires a warrant supported by probable cause.

In light of this disposition, it is not necessary to address defendant's remaining contentions.

Accordingly, the order of the Appellate Division should be reversed, defendant's motion to suppress the evidence obtained from the GPS device should be granted and a new trial ordered.

SMITH, J. (dissenting). Using a GPS device, the police discovered that defendant's car was in a K-Mart parking lot on Christmas Eve. This was obviously not a private place, and no one claims that defendant's constitutional rights would be infringed if his car had been observed there by a human eye or a hidden camera. But the majority finds that evidence of the car's location must be suppressed because the police used a more technologically sophisticated way of obtaining it. I think this holding is unsound. The attempt to find in the Constitution a line between ordinary, acceptable means of observation and more efficient, high-tech ones that cannot be used without a warrant seems to me illogical, and doomed to fail.

I am more troubled by another aspect of the case: the surreptitious attachment of the device to the car, without the car owner's consent. (This event is highlighted in the first sentence of the majority's opinion, but goes virtually unmentioned after that.) I conclude, with some hesitation, that this trespass,

though a violation of defendant's property rights, did not violate his right to be free from unreasonable searches.

I

It is beyond any question that the police could, without a warrant and without any basis other than a hunch that defendant was up to no good, have assigned an officer, or a team of officers, to follow him everywhere he went, so long as he remained in public places. He could have been followed in a car or a helicopter; he could have been photographed, filmed or recorded on videotape; his movements could have been reported by a cellular telephone or two-way radio. These means could have been used to observe, record and report any trips he made to all the places the majority calls "indisputably private," from the psychiatrist's office to the gay bar (majority op at 441-442). One who travels on the public streets to such destinations takes the chance that he or she will be observed. The Supreme Court was saying no more than the obvious when it said that a person's movements on public thoroughfares are not subject to any reasonable expectation of privacy (*United States v Knotts*, 460 US 276, 281 [1983], quoted in majority op at 440). What, then, is the basis for saying that using a GPS device to obtain the same information requires a warrant?

The majority's answer is that the GPS is new, and vastly more efficient than the investigative tools that preceded it. This is certainly true—but the same was true of the portable camera and the telephone in 1880, the automobile in 1910 and the video camera in 1950. Indeed, the majority distinguishes *Knotts* on the ground that it involved a beeper—"what we must now . . . recognize to have been a very primitive tracking device" (majority op at 440). I suspect that the GPS used in this case will seem primitive a quarter of a century from now. Will that mean that police will then be allowed to use it without a warrant?

The proposition that some devices are too modern and sophisticated to be used freely in police investigation is not a defensible rule of constitutional law. As technology improves, investigation becomes more efficient—and, as long as the investigation does not invade anyone's privacy, that may be a good thing. It bears remembering that criminals can, and will, use the most modern and efficient tools available to them, and will not get warrants before doing so. To limit police use of the same tools is to guarantee that the efficiency of law enforcement will increase more slowly than the efficiency of law breakers. If the people of

our state think it worthwhile to impose such limits, that should be done through legislation, not through ad hoc constitutional adjudication, for reasons well explained in Judge Read's dissent (Read, J., dissenting at 457-459).

The Federal and State Constitutions' prohibition of unreasonable searches should be enforced not by limiting the technology that investigators may use, but by limiting the places and things they may observe with it. If defendant had been in his home or some other private place, the police would, absent exigent circumstances, need a warrant to follow him there, whether by physical intrusion or by the use of sophisticated technology (*see Kyllo v United States*, 533 US 27 [2001] [use of thermal-imaging device to detect relative amounts of heat in the home an unlawful search]; *United States v Karo*, 468 US 705, 714 [1984] [monitoring a beeper in a private home violates the rights of those justifiably expecting privacy there]). But the police were free, without a warrant, to use any means they chose to observe his car in the K-Mart parking lot.

The theory that some investigative tools are simply too good to be used without a warrant finds no support in any authority interpreting the Federal or New York Constitution. *Knotts*, despite the majority's attempt to distinguish it, seems to me to establish conclusively that the Fourth Amendment did not prohibit the police "from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afforded them" (460 US at 282). And no New York authority suggests that we would reject *Knotts* as a matter of state constitutional law. *Knotts* was a unanimous decision as to its result (though three Justices declined to endorse the language I have quoted [460 US at 288 (Stevens, J., concurring)]); and, in my view, it was an easy one. If the majority is holding—as it apparently is—that police may never, in the absence of exigent circumstances or probable cause, track a suspect with a GPS device, it has imposed a totally unjustified limitation on law enforcement. It has also presented future courts with the essentially impossible task of deciding which investigative tools are so efficient and modern that they are subject to the same prohibition.

## II

For the reasons explained above, I would have no problem at all with this case if the device had been attached to the car with the consent of the car's owner or co-owner, or if the police had

found some other way to track defendant's movements electronically without trespassing on his property. But, like the majority, I do not care for the idea of a police officer—or anyone else— sneaking under someone's car in the middle of the night to attach a tracking device. I find this the hard aspect of the case (*cf. Knotts*, 460 US at 286 [Brennan, J., concurring] ["this would have been a much more difficult case if respondent had challenged, not merely . . . the monitoring of the beeper . . . but . . . its original installation"]), but I conclude, as did a federal Court of Appeals in a substantially identical case (*United States v Garcia*, 474 F3d 994 [7th Cir 2007]), that what the police did was not an unconstitutional search. (Defendant does not argue that the attachment of the device was a seizure of the car, and I do not consider that possibility.)

As the majority points out, the privacy protected by the constitutional prohibition of unreasonable searches and the property rights protected by the laws against trespass have been divorced for decades. The Supreme Court held in *Katz v United States* (389 US 347, 353 [1967]) that Fourth Amendment protections turn not on whether there was an intrusion upon private property but on whether government conduct "violated the privacy upon which [a person] justifiably relied." The accepted test for whether there has been a "search" for Fourth Amendment purposes has become that stated in Justice Harlan's concurrence in *Katz*: Did government action invade a "reasonable expectation of privacy" (*id.* at 360; *see e.g. Samson v California*, 547 US 843, 847 [2006])? The test under the New York Constitution is the same (*e.g. People v Quackenbush*, 88 NY2d 534, 541 [1996]). The attachment of the GPS device in this case violated defendant's property rights, but it did not invade his privacy.

The device was attached to the outside of the car while it was parked on a public street. No one who chooses to park in such a location can reasonably think that the outside—even the underside—of the car is in a place of privacy. He may reasonably expect that strangers will leave his car alone, but that is not an expectation of privacy; it is an expectation of respect for one's property rights. This distinction is critical: "the existence of a *property* interest does not mean that defendant also had a *privacy* interest protectable by the State and Federal guarantees against unreasonable searches and seizures" (*People v Natal*, 75 NY2d 379, 383 [1990]; *see also People v Reynolds*, 71 NY2d 552 [1988]). No authority, so far as I know, holds that a trespass on

private property, without more, is an unlawful search when the property is in a public place. Such a search occurs only when, as a result of the trespass, some information is acquired that the property owner reasonably expected to keep private (*e.g. Bond v United States*, 529 US 334 [2000] [suppression of drugs found in bus passenger's luggage]; *People v Hollman*, 79 NY2d 181 [1992] [same]).

I am admittedly relying on a fine distinction, but I think I am justified in doing so. When the government violates privacy, and not just property, rights, the exclusionary rule applies; that rule is a blunt instrument, whose effect is often to guarantee an unjust result in a criminal case—in Judge Cardozo's famous phrase, to set the criminal free because the constable has blundered (*People v Defore*, 242 NY 13, 21 [1926], *cert denied* 270 US 657 [1926]). The rule's application should not be expanded to punish every action by a police officer that a court may find distasteful; it should be strictly limited to the protection of constitutional rights—in this case, the privacy rights that are the concern of the Search and Seizure Clauses of the State and Federal Constitutions. Because no one invaded defendant's privacy here, his motion to suppress the evidence obtained from the GPS device should be denied.

READ, J. (dissenting). The majority opinion—while destined to elicit editorial approval—is wrong on the law and unnecessarily burdens law enforcement and the courts, and, more importantly, all New Yorkers. Although aspects of this case are indeed troubling—notably, the unexplained length of time (65 days) the GPS tracking device was affixed to defendant's van—I agree with Judge Smith that there was simply no search within the meaning of the Federal or State Constitution. I write separately to emphasize two untoward consequences of today's decision: first, our state constitutional jurisprudence has been brushed aside; second, we are handcuffing the Legislature by improperly constitutionalizing a subject more effectively dealt with legislatively than judicially in our system of government.

## The Federal Background

To date, the United States Supreme Court has never defined a search within the meaning of the Fourth Amendment to encompass the government's use of tracking devices in lieu of or supplemental to visual surveillance, so long as the tracking occurs outside the home (*see United States v Knotts*, 460 US

276, 282-285 [1983] [monitoring of a tracking device that was inserted into a container but did not reveal information about the inside of a home merely substituted for or supplemented visual surveillance that would have revealed the same facts];[1] *United States v Karo*, 468 US 705, 714-715, 719 [1984] [transfer of a container with a tracking device inside is not a search nor was monitoring it outside the home; monitoring inside a home, however, is a search]; *Kyllo v United States*, 533 US 27, 34 [2001] [using a thermal-imaging device to "obtain( ) by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical intrusion into a constitutionally protected area, constitutes a search—at least where . . . the technology in question is not in general public use" (internal quotation marks and citation omitted)]). As the majority points out, the Supreme Court has not decided the exact question on this appeal: whether the government's use of this particular technology—a GPS tracking device attached to a car—constitutes a search within the meaning of the Fourth Amendment.[2] Still, every lower court judge analyzing the likely outcome of this case as a matter of federal constitutional law has concluded, based on *Knotts* and *Karo* and *Kyllo*, that there was no Fourth Amendment violation. The majority therefore places this decision squarely on independent state constitutional grounds, holding that "there was a search

---

**1.** The Court did *not,* in *Knotts,* "pointedly acknowledge[ ] and reserve[ ] for another day the question of whether a Fourth Amendment issue would be posed if 'twenty-four hour surveillance of any citizen of this country [were] possible, without judicial knowledge or supervision' " (majority op at 442, quoting *Knotts,* 460 US at 283 [which, in turn, was quoting the respondent's brief in that case]). The Court merely noted that the *respondent* "expresse[d] the generalized view" that this would be the result of the holding sought by the government (460 US at 283). The Court responded that "if such *dragnet type* law enforcement practices as [the] respondent envisions should eventually occur, there will be time enough then to determine whether different constitutional principles may be applicable" (*id.* at 284 [emphasis added]; *see also United States v Garcia*, 474 F3d 994, 998 [7th Cir 2007] [After refusing to suppress evidence obtained from GPS tracking device placed on the defendant's car without a warrant, court observed that "(i)t would be premature to rule that . . . a program of mass surveillance could not possibly raise a question under the Fourth Amendment"]). This case—like *Knotts* and *Garcia*—involves the use of GPS monitoring technology in the criminal investigation of an individual suspect, not dragnet-type or mass surveillance.

**2.** Despite an implication to the contrary, the Supreme Court's recent decision in *Arizona v Gant* (556 US —, 129 S Ct 1710 [2009]) does not support the majority's position. *Gant* addressed a search of the interior of a car, an unquestionably protected area. The decision suggests nothing about whether tracking the movements of a vehicle on public roadways constitutes a search under the Fourth Amendment.

under article I, § 12 of the State Constitution. And that search was illegal because it was executed without a warrant and without justification under any exception to the warrant requirement" (majority op at 445).

### Interpreting Our State Constitution

We set out our methodology for state constitutional interpretation in *People v P.J. Video* (68 NY2d 296, 302 [1986]), which described two bases for relying on independent state constitutional grounds: interpretive and noninterpretive review. Interpretive review essentially flows from textual differences between a provision of the State Constitution and its federal counterpart, and is not available here since the operative language of the Fourth Amendment and article I, section 12 is the same (*see People v Harris*, 77 NY2d 434, 437 [1991] ["Because the language of the Fourth Amendment . . . and section 12 of article I . . . is identical, it may be assumed, as a general proposition, that the two provisions confer similar rights"]). "To contrast" with interpretive analysis, we stated that

> "noninterpetive review proceeds from a judicial perception of sound policy, justice and fundamental fairness. A noninterpretive analysis attempts to discover, for example, any preexisting State statutory or common law defining the scope of the individual right in question; the history and traditions of the State in its protection of the individual right; any identification of the right in the State Constitution as being one of peculiar State or local concern; and any distinctive attitudes of the State citizenry toward the definition, scope or protection of the individual right" (*P.J. Video*, 68 NY2d at 303 [citation omitted]).

Here, the majority has not come close to justifying its holding as a matter of state constitutional law in the way called for by *P.J. Video*. First, the majority states that "we have on many occasions interpreted our own Constitution to provide greater protections when circumstances warrant and have developed an independent body of state law in the area of search and seizure" (majority op at 445). This is the assertion of a truism—i.e., that we can and have interpreted article I, section 12 more broadly than the Supreme Court has interpreted the Fourth Amendment. The majority does not identify, much less discuss, the "circumstances" requiring a departure from the federal approach here.

Next, the majority cites a number of cases where we have, in fact, parted ways with the Supreme Court (majority op at 445). But there is no discussion of how the *reasoning* of those cases— *Harris* (involving the defendant's arrest inside his apartment); *People v Dunn* (77 NY2d 19 [1990] [a "canine sniff" revealing the presence of drugs inside the defendant's apartment]); *People v Scott* (79 NY2d 474 [1992] [search of private land owned by the defendant]); and *People v Torres* (74 NY2d 224 [1989] [search of the interior passenger compartment of the defendant's car])—supports deviation from federal precedent in this case. A person's home has always enjoyed a special status as a haven from government intrusion under the Federal and State Constitutions, but in *Dunn* we concluded that the "canine sniff," although a search of the defendant's apartment within the meaning of article I, section 12, could "be used *without a warrant or probable cause*, provided that the police ha[d] a reasonable suspicion that a residence contain[ed] illicit contraband" (*Dunn*, 77 NY2d at 26 [emphasis added]). The majority does not explain why a much higher standard must now be met by law enforcement authorities to justify use of a GPS tracking device attached to a vehicle by a magnet. The majority does not explain how its holding fits in with those decisions where we have recognized the diminished expectation of privacy in a vehicle on a public highway (*see e.g. People v Yancy*, 86 NY2d 239 [1995]; *People v Scott*, 63 NY2d 518 [1984]; *People v Belton*, 55 NY2d 49 [1982]) or with the proposition that, generally, "conduct and activity which is readily open to public view is not protected" by the Fourth Amendment (*People v Reynolds*, 71 NY2d 552, 557 [1988]).

Finally, the majority adverts to the decisions of the highest courts in Washington and Oregon. But the majority does not explain how other state courts' decisions interpreting their own (and different) constitutions are possibly relevant to a noninterpretive analysis, which is explicitly keyed to factors *peculiar* to the State of New York.[3]

---

**3.** *State v Jackson* (150 Wash 2d 251, 76 P3d 217 [2003]) relied in large part on the broader language of the Washington State Constitution's search-and-seizure clause. And *State v Campbell* (306 Or 157, 759 P2d 1040 [1988]) rejected the reasonable-expectation-of-privacy test in *Katz v United States* (389 US 347, 360 [1967, Harlan, J., concurring]) in holding that the warrantless use of a GPS tracking device violated the Oregon State Constitution. The operative language of article I, section 12 of the New York State Constitution and the Fourth Amendment is—as previously noted—identical. Moreover, we

The majority also ignores *People v Di Raffaele* (55 NY2d 234, 242 [1982]), where we declined "to establish a more restrictive standard under the provisions of section 12 of article I of the New York State Constitution" for telephone toll billing records, "concluding that there [was] no sufficient reason for . . . differentiation" from the Fourth Amendment. Similarly, we concluded that the police could place a pen register on a telephone line without a warrant (*People v Guerra*, 65 NY2d 60 [1985]). In *Guerra*, there concededly was no violation of the Fourth Amendment, and we rejected the defendant's plea that article I, section 12 afforded greater protection.

As our case law now stands, then, the State Constitution does not require the police to obtain a warrant in order to follow or "tail" my car to an abortion clinic or a strip club (*see* majority op at 441-442). The police may gather such details as, for example, whether I was actually in the car for this trip, and, if so, whether I was the driver or a passenger, whether I was traveling alone or with others, whether I met anyone outside an abortion clinic or a strip club, and whether I walked inside these establishments, either by myself or accompanied. In addition, the police may photograph me while I am doing these things. A warrant is also not required by the State Constitution in order for the police to review telephone toll billing records or use a pen register and thereby find out how often someone (not necessarily me) calls an abortion clinic or a strip club from my residence. But, as a result of today's decision, a warrant is mandated before the police may attach a GPS tracking device to my car and thereby discover if or how often someone (again, not necessarily me) drives my car by or parks it near an abortion clinic or a strip club. These results are difficult to reconcile; the Court seems to interpret article I, section 12 as affording the *greatest* state constitutional protection to the surveillance technique that garners the *least* specific information about "[t]he whole of [my] progress through the world" (majority op at 441).

The facts in this case illustrate how GPS monitoring technology is less revealing than old-fashioned physical surveillance. Defendant apparently owned two vehicles—a van and a Mercedes Benz automobile. The investigator from the New York State Police attached the battery-powered GPS tracking device to the van on December 21, 2005. The data subsequently

have consistently adhered to the *Katz* test in determining whether a search has taken place, even when recognizing more expansive rights under our Constitution (*see Scott*, 79 NY2d at 486).

retrieved from the device showed that at 7:17 P.M. on December 24, 2005, the van moved from the street where defendant resided to the K-Mart's parking lot, returning at 7:55 P.M. The van then remained parked overnight, not moving again until 7:41 A.M. on December 26, 2005. In other words, defendant's van was nowhere near the K-Mart at the time the store was broken into at roughly 11:00 P.M. on Christmas Eve. The testimony of a witness was necessary for the jury to draw the inference that defendant had driven the van to scout out the K-Mart early on the evening of the break-in because the police did not actually see him behind the wheel. If the police had been watching defendant rather than just monitoring the movements of his van, they might have gathered direct proof of their theory of the crime: that late on Christmas Eve he drove his Mercedes to the K-Mart, and waited in the car while his accomplice burglarized the store.

According to the investigator, the State Police maintain a "small fleet of undercover cars," which may be made available to assist local police agencies with surveillance. The GPS monitoring technology used in this case was less intrusive or informative than physical surveillance of defendant would have been; it was a less optimal way for the police to figure out defendant's movements. But the State Police have limited resources. They may not always have personnel handy to engage in surveillance at the request of a local police agency, or a vehicle's location (for example, in a sparsely populated area) may make it difficult to trail or watch undetected. As Judge Smith observes, to limit police use of GPS monitoring technology, which is readily available to criminals, "guarantee[s] that the efficiency of law enforcement will increase more slowly than the efficiency of law breakers" (Smith, J., dissenting at 448).

Finally, the majority does not examine relevant state statutory law, as called for by noninterpretive analysis. In fact, the Legislature has enacted elaborate statutory provisions to regulate police surveillance; in particular, CPL articles 700 (eavesdropping and video surveillance warrants) and 705 (pen registers and trap and trace devices), adopted after our decision in *Guerra*. But Penal Law § 250.00 (5) (c) specifically states that an "[e]lectronic communication" does *not* include "any communication made through a tracking device consisting of an electronic or mechanical device which permits the tracking of the movement of a person or object." CPL article 700 only requires warrants for those electronic communications covered

by Penal Law § 250.00 (5). In short, the warrant requirement pronounced by the majority today is contrary to, not consistent with, "preexisting State statutory . . . law" (*P.J. Video*, 68 NY2d at 303).

The analytical methodology embodied in our decision in *P.J. Video* has its critics (*see generally* James A. Gardner, Interpreting State Constitutions: A Jurisprudence of Function in a Federal System, at 41-45 [University of Chicago Press 2005]). And there are certainly alternative theories of state constitutional interpretation available for us to adopt (*id.*). Unless the Court frankly embraces another approach, however, we should decide our state constitutional cases in accordance with the principles enunciated in *P.J. Video*: precedent is not "a custom [m]ore honored in the breach than the observance" (Hamlet, act I, scene iv). By disregarding our precedent in this area, a methodology already seen by some as excessively malleable is rendered patently standardless. The public may be left with the impression that we do indeed treat the State Constitution as "a handy grab bag filled with a bevy of clauses [to] be exploited in order to circumvent disfavored United States Supreme Court decisions" (*see* Ronald K.L. Collins, *Reliance on State Constitutions—Away From a Reactionary Approach*, 9 Hastings Const LQ 1, 2 [1981]).

## The Role of the Legislature

We are all familiar with GPS monitoring technology, which is widely used in modern society and serves many worthwhile purposes. For example, GPS tracking devices help us drive our automobiles without getting lost; they may be used to find a stolen vehicle; they assist employers in routing their fleet vehicles and knowing the location of their employees; they can identify the location of miners who are trapped underground as a result of an accident; they may pinpoint the whereabouts of an errant pet; and parents may install GPS devices on their children's cell phones so as to keep track of them.

Certainly, GPS monitoring technology may be abused by law enforcement authorities. As a result, many states have enacted comprehensive legislation governing its use by police for investigative purposes. Generally speaking, these provisions require the police or a prosecutor to make an application to a judge before installing or using a mobile tracking device. The provisions differ considerably in terms of the quantum and nature of the proof required for judicial authorization; but they

do not compel the high threshold insisted upon by the majority here.

For example, at one end of the spectrum are those states that permit the installation and use of a mobile tracking device upon a showing by the applicant "that the information likely to be obtained is relevant to an ongoing criminal investigation" (Utah Code Ann § 77-23a-15.5 [3] [b]; *see also* Minn Stat § 626A.37 [1]; Fla Stat § 934.42 [2] [b]). At the other end of the spectrum are those states requiring a showing of probable cause. But the probable cause in these statutes is not the same as that mandated by the majority here—probable cause to believe that installation of the GPS tracking device on a vehicle will disclose evidence of a crime. Rather, these states merely call for the applicant to certify that "probable cause exists to believe that the information likely to be obtained [from installation and use of a mobile tracking device] is relevant to an ongoing criminal investigation" (SC Code Ann § 17-30-140 [B] [2]; *see also* Okla Stat, tit 13, § 177.6 [A] [no warrant for tracking device "shall issue unless probable cause is shown for believing that such installation or use will lead to the discovery of evidence, fruits, or instrumentalities of the commission or attempted commission of an offense"]; Haw Rev Stat § 803-44.7 [b] [judge should be satisfied "that there are sufficient facts and circumstances contained within the application to establish probable cause to believe that the use of a mobile tracking device will discover the fruits, instrumentalities, or evidence of a crime or is relevant to an ongoing criminal investigation"]). In the middle of the spectrum are those states that apply a "reasonable suspicion" requirement. In Pennsylvania, for example, an applicant must "provide a statement setting forth all facts and circumstances which provide the applicant with a reasonable suspicion that criminal activity has been, is or will be in progress and that the use of a mobile tracking device will yield information relevant to the investigation of criminal activity" (18 Pa Cons Stat § 5761 [c] [4]; *see also* Tex Code Crim Proc Ann, art 18.21, § 14 [c] [5]).

Police surveillance techniques implicate competing values of great importance to all New Yorkers—privacy and security. Absent this decision, our Legislature would have been in a position to look at the variety of GPS-related investigative tools currently available to law enforcement authorities, balance these competing values and fashion a comprehensive regulatory

program (*see e.g.* CPL arts 700 and 705) readily capable of amendment as the science evolves. As the variety of approaches enacted by our sister states' legislatures shows, there are numerous ways to deal with these issues.

Of course, the Legislature is still free to act in this area. But by constitutionalizing this particular GPS monitoring technology, my colleagues in the majority have defined what the Legislature cannot do in a fashion that may make little sense. For example, perhaps the most controversial aspect of this case was the length of time—65 days—the GPS tracking device remained attached to defendant's van. The Legislature might have considered whether to allow law enforcement (with or without a warrant) to place such a device on a vehicle for a limited period of time, based on a reasonable suspicion that this would produce information relevant to an investigation of criminal activity. Because of today's decision, however, this and any number of other potential options that the Legislature (and most New Yorkers) might view as respectful of both privacy and security are off the table: instead, law enforcement authorities will have to obtain a warrant based on probable cause to believe that installation of a GPS tracking device will disclose evidence of a crime. Further, different judges may impose different temporal or other restrictions in the warrant, creating a lack of uniformity even where GPS tracking is permitted. As a result, the utility of this particular GPS monitoring technology as a police investigative tool has been significantly diminished. In effect, by torturing precedent to "find" a new subject of state constitutional protection, the majority has limited the Legislature's liberty to act in the best interests of the state's citizens as a whole.

## Conclusion

Surely, it is up to the judiciary to protect New Yorkers' individual constitutional rights—there is no doubt whatsoever about that; surely, we may establish a greater level of protection under our State Constitution for those rights than the Supreme Court recognizes under a parallel provision of the national Constitution—equally, there is no doubt whatsoever about that; and surely, technological advances may threaten individual privacy by enabling otherwise prohibitively costly surveillance. As a result, safeguards against potential government (and perhaps

private[4]) abuse of these technologies should be explored in New York: protections have, after all, been put into place by many other states' legislatures. But as the majority opinion's thin legal analysis and Judge Smith's dissent show, federal and New York precedents do not transmute GPS-assisted monitoring for information that could have been easily gotten by traditional physical surveillance into a constitutionally prohibited search. By ruling otherwise, the majority calls the Court's institutional integrity into question, and denies New Yorkers the full benefit of the carefully wrought balance between privacy and security interests that other states have struck for their citizens through legislation. For these reasons and those expressed by Judge Smith, I respectfully dissent.

Judges CIPARICK, PIGOTT and JONES concur with Chief Judge LIPPMAN; Judge SMITH dissents in a separate opinion in which Judges GRAFFEO and READ concur; Judge READ dissents in another opinion in which Judge GRAFFEO concurs.

Order reversed, etc.

---

4.  The "Q-ball" involved in this case is apparently relatively cheap and widely available to the public (*see Kyllo*, 533 US at 34 [suggesting that law enforcement does not engage in a constitutionally prohibited search when it uses technology readily accessible to the public]). There is no reason to doubt that private citizens (say, for example, a suspicious spouse) have used these GPS tracking devices to surreptitiously monitor the movements of fellow citizens' vehicles. Today's decision does nothing to prevent this from happening or to curb its incidence.