**The STATE of Ohio, Appellee,**

v.

**JOHNSON, Appellant.**

[Cite as *State v. Johnson,* 190 Ohio App.3d 750, 2010-Ohio-5808.]

Court of Appeals of Ohio,
Twelfth District, Butler County.

No. CA2009–12–307.

Decided Nov. 29, 2010.

752

Robin N. Piper III, Butler County Prosecuting Attorney, and Michael A. Oster Jr., Chief, Appellate Division, for appellee.

William R. Gallagher, for appellant.

HENDRICKSON, Judge.

{¶ 1} Defendant-appellant, Sudinia Johnson, appeals his conviction in the Butler County Court of Common Pleas for one count of trafficking in cocaine and the accompanying specifications and forfeitures. We affirm the decision of the trial court.

{¶ 2} Detective Mike Hackney, a supervisor in the drug-and-vice-investigations unit for the Butler County Sheriff's Office, received information from three separate confidential informants that Johnson was trafficking in cocaine. Specifically, Hackney was informed that Johnson had recently dispersed multiple kilos of cocaine, that Johnson was preparing to acquire seven more kilos, and that Johnson moved the cocaine in a van. Hackney testified at the motion-to-suppress hearing that he had been familiar with Johnson's possessing and driving a white Chevy van at the time the informants gave him the information.

{¶ 3} Hackney and two other agents performed a trash pull at Johnson's residence, and while there, they attached a GPS device to Johnson's van, which was parked on the east side of the road opposite the residences. Hackney testified that he attached the GPS device to the metal portion of the undercarriage of the van. Hackney stated that the device was "no bigger than a pager" and was encased in a magnetic case so that the device did not require any hard wiring into the van's electrical systems.

{¶ 4} Hackney also testified regarding the information that the agents received from the trash pull. Within Johnson's trash, the agents found credit-card transaction receipts from gas purchased on the same day from stations in Cincinnati and Chicago.

{¶ 5} After attaching the device, the agents intermittently tracked the GPS through a secured website. The Tuesday after installation, the GPS indicated that the van was located in a shopping center around Cook County, Illinois. Hackney began making arrangements with law enforcement in Chicago to verify the location of Johnson's van. Bob Medellin, a retired Immigration and Customs officer and employee of the Butler County Sheriff's Office, informed Hackney that he was from the Chicago area and was familiar with the shopping center. Medellin then contacted his brother, Rudy Medellin, also a retired Immigration and Customs officer, who agreed to go to the shopping center and verify the location of Johnson's van.

{¶ 6} Medellin arrived at the Chicago shopping center and confirmed the van's location and that the van matched the description and license-plate number of the van Johnson was known to possess and drive. Hackney and Medellin continued to communicate, and Medellin reported that two men were in the van. Medellin then followed the van from the shopping center to a residence in the Chicago area, where he saw the two men exit the van and enter the residence.

{¶ 7} Medellin saw one man, later identified as Johnson, exit the residence carrying a package or box, and enter the van. Medellin saw the other man, later identified as Otis Kelly, drive away in a Ford that had Ohio plates. Medellin followed Johnson's van and the Ford until they reached the Butler County area and communicated with Hackney via cell phone during the surveillance.

{¶ 8} Hackney continued to contact law-enforcement officials throughout Ohio, readying them to assist once Johnson and Kelly entered Ohio from Indiana. Hackney drove toward Cincinnati and, after coming upon Johnson's van, began to follow him. Hackney advised law-enforcement officers to stop the van and Ford "if they were able to find probable cause to make a stop." Deputy Daren Rhoads, a canine handler with the Butler County Sheriff's Office, initiated a stop after Johnson made a marked-lane violation.

{¶ 9} According to Rhoads's testimony, he spotted Kelly's Ford and Johnson's van and pulled out behind Johnson after another officer began following Kelly's Ford. Rhoads then observed Johnson's van cross over "the fault line before approaching the traffic light" at an intersection. At that point, Johnson's van was in the lane to travel straight through the intersection when instead of going straight, he made an "abrupt right turn," crossing over two lanes of traffic in the process.

{¶ 10} By the time Rhoads initiated the traffic stop, other officers were also in the position to offer back-up. Officers directed Johnson to exit his vehicle and then escorted him onto the sidewalk so that Rhoads could deploy his canine partner. The canine made a passive response on the driver's side door and on

the passenger's side sliding door. After the canine walk-around, Johnson gave his consent to have the van searched.

{¶ 11} Rhoads and other officers performed a preliminary sweep of Johnson's van for narcotics, but did not find any drugs or related paraphernalia in the vehicle. During this time, police vehicles and Johnson's van were situated on the road. After the initial search, officers moved Johnson's van approximately one-tenth of a mile to the location where police had pulled over the Ford driven by Otis Kelly. Officers there had also deployed two canine units around Kelly's Ford, and the canines detected the presence of narcotics. The officers ultimately located seven kilos of cocaine within a hidden compartment in the Ford's trunk and arrested Kelly for possession of cocaine.[1]

{¶ 12} Once the van was situated at the second location, Rhoads continued his search with the help of an interdiction officer for the Ohio State Highway Patrol. The two concentrated on the undercarriage of the van and looked for any hidden compartments that Rhoads may have missed during his preliminary search. No drugs were recovered from the van.

{¶ 13} During the search, Johnson was placed in the back of a police cruiser, and Agent Gregory Barber spoke to Johnson after he received his *Miranda* warning. According to Barber's testimony at the motion-to-suppress hearing, Johnson told Barber, "[Y]ou guys got me." Officers later seized Johnson's keys and discovered that one of the keys on Johnson's key ring opened the hidden compartment in the Ford that contained the seven kilos of cocaine seized from Kelly's vehicle.

{¶ 14} Johnson was later transported to jail where he was Mirandized a second time before he continued his conversation with Barber. Johnson told Barber that he had picked up the cocaine in Chicago and was going to sell it in Middletown in order to pay back money he owed the original sellers in Chicago. Johnson also told Barber that he had spent the rest of the money on televisions, shoes, clothing, and "a lot of shopping," and that all the merchandise was located at his home. Barber applied for and was granted warrants to search Johnson's home and a storage unit. Officers executed the warrants and seized over 50 pairs of Nike Air Jordan shoes, all-terrain vehicles, four flat-screen televisions, clothing, a gun, and multiple vehicles.

{¶ 15} Johnson was indicted on single counts of trafficking in cocaine, possession of cocaine, and having weapons while under disability. Johnson filed multiple motions to suppress, arguing that law enforcement had been required to seek a warrant before attaching the GPS device to his van, that the traffic stop

---

1. This court affirmed Kelly's conviction and sentence in *State v. Kelly,* 188 Ohio App.3d 842, 2010-Ohio-3560, 937 N.E.2d 149.

had been unlawfully initiated, that Johnson had been detained beyond the time frame necessary to issue a ticket or warning, that the search warrants had not been supported by probable cause, and that Johnson had been denied his right against self-incrimination. After a hearing on the motions, the trial court denied each in turn.

{¶ 16} Johnson pleaded not guilty to having weapons while under disability and was acquitted by the trial court. Johnson pleaded no contest to the remaining charges and specifications and was found guilty by the trial court. After the counts were merged for sentencing, the trial court sentenced Johnson to a 15–year prison term and also found that the seized vehicles, televisions, shoes, clothing, and firearm were subject to forfeiture. Johnson now appeals the decision of the trial court, raising the following assignments of error.

{¶ 17} Assignment of Error No. 1:

{¶ 18} "The trial court erred in denying the motion to suppres [sic] when it ruled police did not need a search warrant to place a GPS tracking device on Mr. Johnson's car."

{¶ 19} In Johnson's first assignment of error, he asserts that the trial court erred by not granting his motion to suppress regarding the placement of the GPS device without first obtaining a warrant. This argument lacks merit.

{¶ 20} Appellate review of a ruling on a motion to suppress presents a mixed question of law and fact. *State v. Cochran,* Preble App. No. CA2006–10–023, 2007-Ohio-3353, 2007 WL 1880207, ¶ 12. Acting as the trier of fact, the trial court is in the best position to resolve factual questions and evaluate witness credibility. Id. Therefore, when reviewing the denial of a motion to suppress, a reviewing court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Oatis,* Butler App. No. CA2005–03–074, 2005-Ohio-6038, 2005 WL 3031883. "An appellate court, however, independently reviews the trial court's legal conclusions based on those facts and determines, without deference to the trial court's decision, whether as a matter of law, the facts satisfy the appropriate legal standard." *Cochran* at ¶ 12.

{¶ 21} The Fourth Amendment to the United States Constitution guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *." In order to employ the Fourth Amendment protections, a defendant must have a "constitutionally protected reasonable expectation of privacy." *Katz v. United States* (1967), 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576. The Supreme Court directs reviewing courts to consider a two-part test in order to determine whether the Fourth Amendment is implicated. "[F]irst, has the individual manifested a subjective expectation of privacy in the object of the

challenged search? Second, is society willing to recognize that expectation as reasonable?" *California v. Ciraolo* (1986), 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210, citing *Katz* at 360.

{¶ 22} Johnson asserts that he had a reasonable expectation of privacy in his van so that law enforcement should have obtained a search warrant before placing the GPS device on the undercarriage of his van. However, we find that placing the GPS on the van and monitoring its movement did not constitute a search or seizure under either the federal or Ohio constitutions.

{¶ 23} The Supreme Court has long held that there is no reasonable expectation of privacy in the exterior of a car because "[t]he exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a 'search.'" *New York v. Class* (1986), 475 U.S. 106, 114, 106 S.Ct. 960, 89 L.Ed.2d 81. See also *United States v. Rascon–Ortiz* (C.A.10, 1993), 994 F.2d 749, 754 ("[t]he undercarriage is part of the car's exterior, and as such, is not afforded a reasonable expectation of privacy").

{¶ 24} Rather than merely looking under Johnson's undercarriage, Detective Hackney placed a magnetized GPS device on the van. Therefore, in order to determine whether Hackney's placing the device constituted a search or seizure, we must first consider whether Johnson has demonstrated that he intended to preserve the undercarriage of his van as private.

{¶ 25} Johnson did not produce any evidence that demonstrated his intention to guard the undercarriage of his van from inspection or manipulation by others. During the motion-to-suppress hearing, Detective Hackney testified that while the other agents pulled Johnson's trash from the curb, he approached Johnson's van, lay down on the sidewalk, and placed the device under the passenger's side portion of the undercarriage. At the time Hackney approached the van and attached the device, Johnson's van was parked on the public street, opposite the residences.

{¶ 26} During cross-examination, Johnson did not challenge Hackney's statement regarding the public way in which Johnson's van was situated or offer any evidence that Johnson had attempted to keep the van private from public scrutiny. See *United States v. Pineda–Moreno* (C.A.9, 2010), 591 F.3d 1212, 1215 (upholding the warrantless placement of a GPS device after finding that appellant had no reasonable expectation of privacy in a vehicle parked in his driveway where the appellant "did not take steps to exclude passerby [sic]" from the area); and *United States v. Marquez* (C.A.8, 2010), 605 F.3d 604, 610, (a "warrant is not required when, while the vehicle is parked in a public place, [law enforcement] install[ed] a non-invasive GPS tracking device on it for a reasonable period of time").

{¶ 27} According to Johnson's argument, a search and seizure also occurred because law enforcement was able to track the van's movement and collect information regarding where Johnson traveled and where his van was located on any given occasion. However, like other courts, we find this argument meritless.

{¶ 28} Supreme Court precedent has established not only that a vehicle's exterior lacks a reasonable expectation of privacy, but also that one's travel on public roads does not implicate Fourth Amendment protection against searches and seizures. In *United States v. Knotts* (1983), 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55, the court reversed the decision of the Eighth Circuit Court of Appeals to suppress evidence that was gathered as a result of a warrantless installation of a beeper within a drum of chloroform. The suspect loaded the drum into his car, and law enforcement tracked the beeper to determine the driver's final destination.

{¶ 29} After citing *Katz's* test for determining the applicability of the Fourth Amendment, the court determined that " '[o]ne has a lesser expectation of privacy in a motor vehicle because its function is transportation * * *. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view.' " (Citation omitted.) Id. at 281, 103 S.Ct. 1081, 75 L.Ed.2d 55. The court held that "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." Id.

{¶ 30} In an attempt to combat this long-held precedent, Johnson now argues that the GPS device that Hackney installed is different from the beeper discussed in *Knotts* because of technological advances and the ability of law enforcement to track suspects with unparalleled accuracy. Johnson asks this court to depart from *Knotts,* and instead, apply principles set forth by the Supreme Court regarding private telephone calls or the use of hypertechnical instruments to gather information on a suspect.

{¶ 31} In *Katz,* the court addressed what rights are implicated by talking on the phone in a public phone booth and held that "[t]he Government's activities in electronically listening to and recording the [suspect's] words violated the privacy upon which he justifiably relied while using the telephone booth and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment." 389 U.S. at 353, 88 S.Ct. 507, 19 L.Ed.2d 576.

{¶ 32} In *Kyllo v. United States* (2001), 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94, the court was asked to decide whether law enforcement is required to obtain a warrant before using thermal-imaging devices to detect drug-related paraphernalia and equipment within a suspect's home. The court held that where "the Government uses a device that is not in general public use, to explore

details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant." Id. at 40.

{¶ 33} However, the use of a GPS device is dissimilar to the government's tapping a phone booth to record private phone calls or using thermal imaging to discover details hidden in one's home. Unlike the defendants in *Katz* and *Kyllo*, Johnson made no attempt to make his activities private, nor did he assert any expectation of privacy. Instead, Johnson parked his van on a public street, did not take any precaution to exert a privacy interest over it, and then openly traveled on the road where any onlooker could see his movement and arrival. We also note that unlike the thermal-imaging equipment used in *Kyllo*, GPS devices are readily available for purchase and use by the general public. See *United States v. Garcia* (C.A.7, 2007), 474 F.3d 994, 995 (GPS devices are "commercially available for a couple of hundred dollars." It lists a website on which the general public can purchase GPS devices).

{¶ 34} More importantly, the information gathered from the GPS device shows no more information than what detectives could have obtained by visual surveillance. Detective Hackney testified that he would sporadically log onto a secure website and view the position of Johnson's van, but could tell nothing more from the GPS report than the approximate location of the van or how long it had been at a location. This same information could have been ascertained had a member of law enforcement tracked Johnson or employed surveillance techniques that require no technology. There is no question that following a suspect on a public road is not a search that implicates the Fourth Amendment, and "scientific enhancement of this sort raises no constitutional issues which visual surveillance would not also raise." *Knotts*, 460 U.S. at 285, 103 S.Ct. 1081, 75 L.Ed.2d 55. See *Garcia*, 474 F.3d at 997: GPS installation did not require a warrant where tracking substituted "an activity, namely following a car on a public street, [which] is unequivocally *not* a search within the meaning of the amendment." (Emphasis sic.)

{¶ 35} Johnson essentially argues that the GPS device is more than a substitute for surveillance. According to his argument before this court, "GPS is not a mere enhancement of human senses, it facilitates a new perception of the world in which any object may be followed and exhaustively recorded over an unlimited period of time." However, neither the Fourth Amendment nor the Supreme Court's interpretation of it requires police to forego technology simply because it makes police work more efficient or acts as a substitute for countless man hours.[2]

---

2. See Judge Smith's dissent in *N.Y. v. Weaver* (2009), 909 N.E.2d 1195, 1204, 12 N.Y.3d 433, 882 N.Y.S.2d 357 ("It bears remembering that criminals can, and will, use the most modern

{¶ 36} The court released *Knotts* in 1983, at which time the beeper used to track the suspect was an emerging technological advance in detective work. Even then, the court dismissed the argument that police cannot employ technological advances without a warrant simply because such advances permit law enforcement to work more efficiently. "The fact that the officers in this case relied not only on visual surveillance, but on the use of the beeper to signal the presence of [the suspect's] automobile to the police receiver, does not alter the situation. Nothing in the Fourth Amendment prohibited the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afforded them in this case." 460 U.S. at 282, 103 S.Ct. 1081, 75 L.Ed.2d 55. "We have never equated police efficiency with unconstitutionality * * *." Id. at 284.

{¶ 37} Hackney's testimony reveals that he employed the GPS device to estimate the location of Johnson's van at the shopping center near Chicago, something that could have easily been done had a Butler County officer followed Johnson on his day-trip to Chicago. "The fact that the GPS device allowed [law enforcement] to overcome the impracticality of 24–hour visual surveillance is irrelevant. It has long been established that sense enhancement devices, to the extent that they do not reveal more than could have been observed by the naked eye, are permissible." *United States v. Jesus–Nunez* (July 27, 2010), M.D.Pa. No. 1:10–CR–00017–01, 2010 WL 2991229, *3.

{¶ 38} Hackney's use of the GPS did not reveal any more information that could have been observed by his, or another officer's, naked eye. Just as in *Knotts,* Hackney relied in part on the GPS, but also sought the help of Rudy Medellin in order to verify the van's location and to offer important information regarding the suspects in the van. In fact, the information obtained from Medellin far outweighed in particularity and effect the data collected by the GPS device. Medellin was able to directly place Johnson's van in the shopping center, verify the license plate, and report information regarding the two men who sat in the van. Medellin then followed these men to a residence and reported that Johnson had carried a box to his van while the other man departed from the garage in a Ford. Medellin then followed the van and the Ford, which did not have any GPS device attached, until the vehicles reached Butler County. The information provided by Medellin's "old-fashioned" or "low-tech" tracking and surveillance eventually led to the discovery of seven kilos of cocaine and was far more damaging than the mere indication that Johnson's van was near Chicago.

---

and efficient tools available to them, and will not get warrants before doing so. To limit police use of the same tools is to guarantee that the efficiency of law enforcement will increase more slowly than the efficiency of law breakers").

{¶ 39} Johnson further submits that the GPS device in some way violated his reasonable expectation of privacy in his right to free association. Essentially, Johnson argues that should law enforcement be permitted to install and monitor GPS devices without first obtaining a warrant, the government has unfettered and instantaneous access to a person's whereabouts. In his brief to this court, Johnson warns that through GPS, the government can track "trips to a minister, a psychiatrist, abortion clinic, union meeting, home of a police critic, divorce attorney office, gay bar, AIDS treatment clinic and on and on."

{¶ 40} We do not disagree with Johnson that GPS surveillance could report a person's location at these or any location. However, Johnson fails to recognize that when a person chooses to drive his vehicle to the minister, psychiatrist, abortion clinic, etc., he is voluntarily letting that fact be known to anyone on the roads, or anyone choosing to follow him, of his intended destination. Law enforcement need not obtain a warrant to observe where a driver chooses to drive on public roads, nor does it need to obtain a warrant to observe via a GPS device where a driver chooses to drive.

{¶ 41} Johnson relies heavily on three cases in which state courts have found GPS installation to be a search that requires a warrant. However, we find these cases unpersuasive because the courts applied their own respective state constitutions in reaching their decision. New York's highest court premised its holding on its "State Constitution alone" and held that the installation of a GPS constitutes a search. *New York v. Weaver* (2009), 12 N.Y.3d 433, 882 N.Y.S.2d 357, 909 N.E.2d 1195, 1202. There, the court noted that it had "on many occasions interpreted [its] own Constitution to provide greater protections when circumstances warrant" and further stated that it had "adopted separate standards 'when doing so best promotes "predictability and precision in judicial review of search and seizure cases and the protection of the individual rights of our citizens." ' " (Citations omitted.) Id.

{¶ 42} Similarly, Washington's Supreme Court held that installation of a GPS requires a warrant under its state constitution. *State v. Jackson* (2003), 150 Wash.2d 251, 76 P.3d 217. The court specifically stated that Jackson did not challenge his conviction on Fourth Amendment grounds, but instead relied on the article and section of the "Washington State Constitution" specific to search and seizure. The court began its analysis by quoting from its constitution that "no person shall be disturbed in his private affairs, or his home invaded, without authority of law." Id. at 222. The court noted that its constitution is broader than the Fourth Amendment because it focuses on privacy interests that its citizens are "entitled to hold" and that consequently, "[i]t is now settled that article I, section 7 is more protective than the Fourth Amendment." Id.

{¶ 43} The Oregon Supreme Court also held that installation of a GPS and tracking associated data requires a warrant. *State v. Campbell* (1988), 306 Or. 157, 759 P.2d 1040. However, the court spent a considerable amount of its analysis comparing its state constitutional provisions regarding search and seizure with that of the federal Constitution. The court expressed its "doubts about the wisdom of defining [its Constitution] in terms of 'reasonable expectations of privacy,' " and instead, "expressly reject[ed]" the reasonable-expectation-of-privacy standard for defining searches under its Constitution. Id. at 1044. According to Campbell, the Oregon constitution protects its citizens' privacy because they have a *"right"* to it, not because that privacy expectation is reasonable. (Emphasis sic.) Id.

{¶ 44} Although these three courts have ruled contrary to the analysis we now assert, each relied on a state constitution that differed from or offered greater protections that those guaranteed by the Fourth Amendment. Ohio's constitution, however, does neither.

{¶ 45} The Ohio Supreme Court has held that Ohio's Constitution does not impose greater restrictions or broader guarantees than the Fourth Amendment regarding the legality of searches and seizures. *State v. Robinette* (1997), 80 Ohio St.3d 234, 685 N.E.2d 762. In that case, the court analyzed whether the "provisions are similar and no persuasive reason for a differing interpretation is presented." Id. at 238. The court noted that the language within Section 14, Article I of Ohio's Constitution is virtually identical to that of the Fourth Amendment.[3] Beyond the language, the court noted that there was no persuasive reason for broadening the Fourth Amendment where there was an "absence of explicit state constitutional guarantees protecting against invasions of privacy that clearly transcend the Fourth Amendment." Id. at 239.

{¶ 46} Unlike the states mentioned above that interpret their constitutions to provide protections different from those guaranteed by the Fourth Amendment, we are guided by the Ohio's Supreme Court's holding that Ohio's constitutional provisions regarding search and seizure afford "the same protection as the Fourth Amendment" and that " 'the reach of Section 14, Article I, of the Ohio Constitution * * * is coextensive with that of the Fourth Amendment.' " (Citations omitted.) Id. at 238–239, 685 N.E.2d 762.

{¶ 47} Because Johnson did not have a reasonable expectation of privacy in the undercarriage of his vehicle, and because placing a GPS device on a vehicle to

---

3. Section 14, Article I of the Ohio Constitution provides, "[T]he right of the people to be secure in their persons, houses, papers, and *possessions*, against unreasonable searches and seizures shall not be violated * * *," whereas the Fourth Amendment states, "[T]he right of the people to be secure in their persons, houses, papers, and *effects*, against unreasonable searches and seizures, shall not be violated * * *." (Emphasis added.)

track the vehicle's whereabouts does not constitute a search or seizure according to the Fourth Amendment and Ohio's Constitution, Johnson's argument fails, and his first assignment of error is overruled.

{¶ 48} Assignment of Error No. 2:

{¶ 49} "The stop and detention of Johnson violated his right to be free of unreasonable search and seizures as guaranteed by the United States and Ohio constitutions."

{¶ 50} In his second assignment of error, Johnson asserts that the trial court erred in denying his motion to suppress because law enforcement was not authorized to perform a traffic stop on the night he was arrested. This argument lacks merit.

{¶ 51} Regarding the legality of an initial traffic stop, "[w]here a police officer stops a vehicle based on probable cause that a traffic violation has occurred or was occurring, the stop is not unreasonable under the Fourth Amendment to the United States Constitution even if the officer had some ulterior motive for making the stop, such as a suspicion that the violator was engaging in more nefarious criminal activity." *Dayton v. Erickson* (1996), 76 Ohio St.3d 3, 665 N.E.2d 1091, syllabus. An officer's observation that a driver has committed a marked-lane violation establishes probable cause that a traffic violation has occurred. *State v. Calori*, Portage App. No. 2006–P–007, 2007-Ohio-214, 2007 WL 136044, ¶ 22.

{¶ 52} According to R.C. 4511.33, "(A) Whenever any roadway has been divided into two or more clearly marked lanes for traffic, or whe[n]ever within municipal corporations traffic is lawfully moving in two or more substantially continuous lines in the same direction, the following rules apply: (1) A vehicle or trackless trolley shall be driven, as nearly as is practicable, entirely within a single lane or line of traffic and shall not be moved from such lane or line until the driver has first ascertained that such movement can be made with safety."

{¶ 53} According to Deputy Daren Rhoads's testimony at the motion-to-suppress hearing, Johnson's van crossed over "the fault line before approaching the traffic light" at an intersection. At that point, Johnson's van was in the lane to travel straight through the intersection, when instead of going straight, Johnson made an "abrupt right turn," and in the process, crossed over two lanes of traffic.

{¶ 54} Johnson now asserts that the traffic stop was unlawful because he had made the turn in a safe manner and in accordance with the statute. On cross-examination, Johnson asked Rhoads whether the deputy thought the turn across two lanes of traffic was done in a safe manner. Rhoads recalled that Johnson did

not cut off any other driver and otherwise performed the maneuver in a safe manner.

{¶ 55} However, the Ohio Supreme Court has held that "a traffic stop is constitutionally valid when a law-enforcement officer witnesses a motorist drift over the lane markings in violation of R.C. 4511.33, even without further evidence of erratic or unsafe driving." *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 25. Deputy Rhoads observed Johnson's van drift over the fault line and then saw Johnson make an abrupt right turn over two lanes of traffic from a lane designated for going straight through the light. Regardless of a lack of erratic or unsafe driving, Johnson's marked-lane violations provided probable cause so that Rhoads was justified in initiating the traffic stop.

{¶ 56} The trial court viewed a recording of the moments prior to Johnson's traffic stop captured by video equipment in Rhoads's police cruiser. After viewing the tape, the court stated, "I am just telling you that I observed the video and I saw [Johnson] cross a solid white line, across another lane, from a straight driving lane across a turn lane and then make that right turn. And in my view, there is reasonable articulable suspicion if I had viewed that to believe that there was a traffic violation that occurred." We find no error in the trial court's conclusion regarding the initial legality of the traffic stop.

{¶ 57} Johnson next challenges the length of his detention after the traffic stop and asserts that even if the stop was legal at its inception, the subsequent detention and search violated his constitutional rights. However, a review of the record indicates otherwise.

{¶ 58} "In conducting a stop of a motor vehicle for a traffic violation, an 'officer may detain an automobile for a time sufficient to investigate the reasonable, articulable suspicion for which the vehicle was initially stopped.' However, an investigative stop may last no longer than is necessary to effectuate the purpose of the stop. Thus, when detaining a motorist for a traffic violation, an officer may delay the motorist for a time period sufficient to issue a ticket or a warning. This time period also includes the period of time sufficient to run a computer check on the driver's license, registration, and vehicle plates." (Citations omitted.) *State v. Howard*, Preble App. Nos. CA2006–02–002 and CA2006–02–003, 2006-Ohio-5656, 2006 WL 3059799, ¶ 14–15. Furthermore, a canine sniff of a vehicle may be conducted during the time necessary to effectuate the original purpose of the stop, and an alert by a trained narcotics dog provides law enforcement with probable cause to search the vehicle for contraband. Id. at ¶ 17.

{¶ 59} Deputy Rhoads testified that immediately after the traffic stop, he deployed his canine partner around the van and that the dog indicated the

presence of drugs at two different locations on Johnson's van within minutes of the stop. Rhoads also testified that Johnson gave his consent for the officers to perform a more detailed search of the van once the dog indicated the presence of drugs. Officers then moved the van from blocking the public street to a more secure location one-tenth of mile away.

{¶ 60} These events occurred well within the time necessary for Deputy Rhoads to effectuate the purpose of the traffic stop. It is irrelevant that Rhoads did not issue a traffic citation for Johnson's violation of R.C. 4511.33 because he had probable cause to initiate the lawful traffic stop. See *State v. Kelly*, 188 Ohio App.3d 842, 2010-Ohio-3560, 937 N.E.2d 149 (upholding legality of traffic stop and subsequent search even though officers did not issue a citation after Kelly followed the vehicle in front of him too closely).

{¶ 61} Having found that the traffic stop was lawful at its inception and that the dog sniff and subsequent search were conducted in the time sufficient to investigate the reason for the stop, Johnson's second assignment of error is overruled.

Judgment affirmed.

YOUNG, P.J., and RINGLAND, J., concur.

