*605 OPINION OF THE COURT
John L. DeMarco, J.
Defendant is charged with murder in the second degree (Penal Law § 125.25 [1]), in connection with the June 26, 2011 death of Calvin Reid. On July 1, 2011, investigators from the Rochester Police Department requested that defendant’s cell phone provider “ping” defendant’s cell phone in order to obtain its approximate location. The provider pinged the phone and, as a result, the investigators located the phone. The phone was inside a backpack that was found at a home on 15 Zimbrich Street in the City of Rochester. Defendant moved to suppress all evidence obtained as a result of the “pinging” of his cell phone on July 1, 2011. On August 7, 2012, the court conducted a suppression hearing on that issue and reserved decision. Both parties made post-hearing submissions. The following constitutes the court’s findings of fact and conclusion of law:
Findings of Fact
Rochester Police Investigators Penkitis and Lucci were the lead homicide investigators in the June 26, 2011 Calvin Reid homicide that occurred near 862 Hudson Avenue in the City of Rochester. Within one day of the homicide, a person with an alias of “Dutch” was developed as a suspect. A bulletin was distributed to police officers that contained still photos from a nearby store surveillance video taken shortly before the murder. On June 28, 2011, Tracy Corporan made an identification of a person she knew as “Dutch” from the still photos. By June 29, 2011, the police knew that defendant was the person they were looking for in connection with Reid’s murder and they had an address for him on Garson Avenue.
On June 29, 2011, the investigators obtained a cell phone number for defendant, which Lucci confirmed with defendant’s grandmother and another person. Although they had developed “what addresses [defendant] might be at,” they did not try to arrest him, hoping to develop a better case, which, in part, included obtaining information from defendant’s cell phone and historical cell site location information. The investigators completed a form entitled “Exigent Circumstances Request” (request), for Sprint, defendant’s cell phone provider, to “ping” defendant’s cell phone, in order to obtain its present location. The request declared that an exigent situation existed involving “immediate danger of death or serious bodily injury to any person,” namely, “homicide suspect who we have reason to *606 believe he is about to kill another person.” That statement was based upon information the investigators had that Calvin Reid was not the intended target. Sprint could not successfully ping the phone as it had been “powered off.”
Lucci asked Sprint to ping the phone again on July 1, 2011, at 12:50 p.m., acting on the authority of the earlier request. Sprint achieved a successful pinging of the phone, but advised that a new request was necessary because a request expires after 48 hours. An investigator prepared another request to Sprint, describing the exigency to be: “Homicide suspect who is involved in continuing acts of violence, most recently a shooting occurring last night, 6/30/11.” The investigator based that statement on the fact that there was shooting on Resolute Street, thought to be in retaliation for Reid’s murder.
Meanwhile, Lucci was advised by Sprint that it had an “11 meter ping” of the phone on Zimbrich Street, between Remington Street and Joseph Avenue. Lucci recalled that the address of an individual in the store surveillance video, Emmanuel Madera, was 15 Zimbrich Street, so officers set up a surveillance of that address. They saw a vehicle leave that address and intercepted the vehicle, although Sprint pinged the phone again and determined its location had not changed. The Zimbrich address was the home of the mother of one of the occupants of the vehicle, Jennifer Rodriguez. Rodriguez’s mother was out of town and Ms. Rodriguez had been at the home to check on it. Rodriguez gave the police permission to search her mother’s home. Once the police investigators were inside the home, they placed a call to defendant’s phone and followed the sound to locate it. They found it inside a knapsack that was under a cot on the front porch. The front of the knapsack contained the words “Dutch” and “Ave. D and Hudson,” handwritten in red marker. Rodriguez’s brother, Emmanuel Madera, was a friend of defendant. The police seized the knapsack.
Conclusions of Law
Standing
In his motion papers, defendant asserted that he had standing to challenge the search and seizure of his knapsack and its contents, which included his phone. In their responding motion papers, the People stated that the “factual allegations that have been supplied are insufficient to warrant such an inquiry.”
In his post-hearing submission, defendant also asserts that he has standing to challenge the search and seizure of his “detailed *607 real time and historical location information as the owner and operator of the cell phone.” He maintains that he had a reasonable expectation of privacy in the phone, even though it was not found on his person or in his home, but at 15 Zimbrich Street. Further, he denies that he “abandoned” the phone. In fact, he states that because the phone was found in a “secreted place” in a friend’s home, that demonstrated “a vivid canvas of calculated and private safekeeping,” the “very antithesis of abandonment.”
The People respond that the evidence adduced at the suppression hearing failed to show that defendant had a reasonable expectation of privacy in the property. They assert that because the phone was found at 15 Zimbrich Street, without any explanation about how it got there, the reasonable assumption is that “defendant gave away the backpack and its contents without a concern for the recovery of its contents.” The People point out that the proof did not show that defendant had any connection to the home, i.e., there was nothing in the home, other than the backpack, with defendant’s name on it, and there was no proof that defendant slept there, had mail delivered there, stayed there, or even visited there.
A “defendant seeking suppression of evidence obtained as the result of an alleged illegal search must prove standing to challenge the search” (People v Hunter, 17 NY3d 725, 726 [2011]; see People v Ramirez-Portoreal, 88 NY2d 99, 108 [1996]). “Standing exists where a defendant was aggrieved by a search of a place or object in which he or she had a legitimate expectation of privacy” (People v Burton, 6 NY3d 584, 587 [2006]). “This burden is satisfied if the accused subjectively manifested an expectation of privacy with respect to the location or item searched that society recognizes to be objectively reasonable under the circumstances” (id. at 588). It is a two-part test. The first component — the subjective component — is whether defendant exhibited an expectation of privacy in the items searched, “that is, did he seek to preserve something as private” (People v Ramirez-Portoreal, 88 NY2d at 108). The second component— the objective component — is whether defendant’s expectation of privacy is “justifiable under the circumstances” (id.). Moreover, “[sjtanding to challenge a search is not established by asserting a possessory interest in the goods seized — defendant must assert a privacy interest in the place or item searched” (id.). The Court of Appeals in Ramirez-Portoreal (88 NY2d at 109) summed up the principles of standing as follows:
*608 “In sum, standing to seek suppression of evidence requires the defendant to establish, by defendant’s own evidence or by relying on the People’s evidence, that he or she had a legitimate expectation of privacy in the place or item that was searched. The suppression court must identify the object of defendant’s expectation of privacy, determine whether defendant exhibited an expectation of privacy in it, and evaluate whether the circumstances would lead society to regard defendant’s expectation as reasonable. If the court determines that defendant had a legitimate expectation of privacy in the item searched, standing to challenge the legality of the police conduct is established.” (Citation omitted.)
In the context of a challenge to the legality of a police search, the People may argue, as they do here, that suppression is not warranted because defendant abandoned the property. Property is deemed abandoned when the expectation of privacy in the object or place searched has been given up by voluntarily and knowingly discarding the property and the result is a waiver of the constitutional protection; the burden rests with the People to establish the waiver (id. at 110). Defendant’s intention to relinquish an expectation of privacy will be found if the circumstances demonstrate a “purposeful divestment of possession of the item searched” (id.). However, even where abandoned, if the abandonment is precipitated by unlawful police conduct, then the seized property may be suppressed because it constitutes the fruit of the poisonous tree (id.). Where property is found to have been abandoned, there is no search or seizure (see People v Burkett, 98 AD3d 746 [2d Dept 2012]).
This court concludes that defendant established standing to challenge the search and seizure of the backpack containing the cell phone. Defendant successfully asserted an ownership interest in the backpack and its entire contents, including the cell phone, and defendant’s expectation of privacy in those items is something that society recognizes as reasonable. The court further concludes, however, that defendant subsequently abandoned that property — he knowingly and voluntarily relinquished his expectation of privacy in the property that was found at 15 Zimbrich Street, i.e., there is no proof that defendant lived there, had mail delivered there, stayed there or even visited there and there is no proof that he gave the backpack to Madera for safekeeping or that he placed it in Madera’s home. Consequently, because he abandoned it, there was no search *609 and seizure and the Fourth Amendment was not implicated. Therefore, defendant’s motion to suppress the backpack and its contents and all property derived therefrom is hereby denied in its entirety.
Despite the court’s determination that defendant abandoned the evidence sought to be suppressed — the backpack and its contents — the court nonetheless will address the merits of defendant’s suppression motion. This decision is intended to address the expectation of privacy, if any, directed at the pinging or signal of the cell phone, not the content of any phone communication or conversation. It is well recognized that, with respect to the latter, there can be an expectation of privacy, whereas no New York State court has made that determination regarding the pinging or signal from a cell phone.
Real Time or “Pinging” Evidence
Defendant asserts that the investigators lacked statutory authority to request Sprint to ping his cell phone and, in the absence of a search warrant or court order, they violated his federal and state constitutional rights when they did so. He seeks suppression of all evidence obtained as a result.
By way of background, GPS — Global Positioning System — is a space-based radionavigation utility owned by the United States that provides highly accurate positioning, navigation and timing services worldwide to any device equipped with a GPS satellite receiver (see GPS.gov, The Global Positioning System, http://www.gps.gov/systems/gps). To determine the location of a cell phone using GPS technology, special hardware in the user’s handset calculates the latitude and longitude of the cell phone in real time based upon the relative strengths of signals from multiple satellites (see ECPA Reform and the Revolution in Locations Based Technologies and Services: Hearing Before the Subcomm. on the Constitution, Civil Rights and Civil Liberties of the House Comm on the Judiciary, 111th Cong, 2d Sess 20, 21 [2010]).
“Cellular service providers typically do not maintain records of the GPS coordinates of cellular telephones operating on their network, but the provider may generate such location data at any time by sending a signal directing the built-in satellite receiver in a particular cellular telephone to calculate its location and transmit the location data back to the service provider. This process, known as ‘pinging,’ is undetectable to the cellular telephone user.” (In re *610 Application of United States for an Order Authorizing Disclosure of Location Info. of a Specified Wireless Tel., 849 F Supp 2d 526, 534 [D Md 2011].)
The cell phone needs to be turned on, but no phone calls need to be made, received or completed for the service provider to ping a cell phone and determine its location. However, a user can deactivate or disable GPS services on his or her cell phone.
A. Statutory Authority/Violation
Defendant asserts that the police lacked statutory authority to ping his phone. The People rely on United States v Gilliam (2012 WL 4044632, 2012 US Dist LEXIS 130248 [SD NY, Sept. 12, 2012, No. 11 Crim. 1083]) for the proposition that the pinging was authorized and justified as an exigent circumstance under the Stored Communications Act (18 USC §§ 2701, 2702 [c] [4]). That statute permits a service provider to disclose customer records “to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency” (18 USC § 2702 [c] [4]).
The People claim that pinging was permissible under the Stored Communications Act because exigent circumstances existed. This court rejects that argument. To justify a need for GPS information as an exigent circumstance, there must be an immediate “danger of death or serious physical injury.” The Gilliam case cited by the People involved sex trafficking of a missing child and transporting her across state lines. The exigent circumstance exception applied there to justify the pinging because the police had reason to believe that there was an urgent need to act — namely the potential sexual exploitation of a minor taken across state lines. The pinging was sought to locate the suspect and his victim to prevent ongoing sexual exploitation. The pinging here was sought to permit the investigators to locate defendant’s cell phone; under these facts, clearly not an exigent circumstance.
Defendant relies on opinions of several federal magistrates who denied the government’s requests for a court order or a search warrant allowing the government to obtain prospective or real time cell site data for an extended period of time.
For example, Magistrate Jonathan Feldman of the District Court of the Western District of New York in In re Application of the United States for an Order Authorizing the Installation and Use of a Pen Register (415 F Supp 2d 211 [2006]) denied *611 the government’s request for real time or current cell site data. The Magistrate rejected the government’s argument that the court had authority to direct the cell service provider to provide real time data based on a collective combination of federal statutes, specifically 18 USC §§ 3322, 3123 (Pen Register and Trap and Trace Statute), 47 USC § 1002 (a) (2) (Communications Assistance for Law Enforcement Act of 1994) and 18 USC § 2703 (c) and (d) (Electronic Communications Privacy Act, including the Stored Communications Act). The government asserted that Congress intended for the court to combine various provisions of various statutes, but the Magistrate declined to impute that intent to Congress.
This court concludes the police did not have any federal statutory authority to request Sprint to ping defendant’s phone in the absence of a court order or warrant. The parties agree that there is no state statute that governs this issue. That begs the question, however, of whether suppression would have been the proper remedy.
“Although exclusion is the proper remedy for some violations of the Fourth Amendment, there is no exclusionary rule generally applicable to statutory violations. Rather, the exclusionary rule is an appropriate sanction for a statutory violation only where the statute specifically provides for suppression as a remedy or the statutory violation implicates underlying constitutional rights such as the right to be free from unreasonable search and seizure” (United States v Abdi, 463 F3d 547, 556 [6th Cir 2006], cert denied 551 US 1104 [2007]; accord United States v Guzman, 879 F Supp 2d 312 [ED NY 2012]).
Here, there is no independent suppression remedy in the text of any statute for failing to obtain a court order or warrant. The issue to be resolved then is whether defendant’s Fourth Amendment rights were implicated.
B. Fourth Amendment and “Pinging”
The Fourth Amendment provides in relevant part that “[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated” (US Const 4th Amend). The Fourth Amendment does not guarantee against all searches and seizures, only those that are unreasonable (see United States v Sharpe, 470 US 675, 682 [1985]). Searches conducted outside the judicial *612 process, without prior approval by a judge or magistrate, are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions (see Katz v United States, 389 US 347, 357 [1967] [some of those exceptions include consent searches, searches for items in plain view, automobile searches, searches conducted incident to a valid arrest — clearly not applicable here]). If no search occurred, the Fourth Amendment is not implicated.
Thus, the initial issue to be resolved is whether pinging defendant’s cell phone to obtain its location constituted a search within the meaning of the Fourth Amendment. Most recently, the U.S. Circuit Court of Appeals, Sixth Circuit, in United States v Skinner (690 F3d 772 [2012]), held that there was no Fourth Amendment violation when federal agents used data emanating from defendant’s cell phone to determine it’s real time location as he transported drugs along the highway. The agents pinged the phone along the way to locate it and arrested the defendant. The federal appeals court found that the defendant did not have a reasonable expectation of privacy in the GPS data and rejected his argument that the use of the GPS location information emitted from his cell phone was a warrantless search in violation of the Fourth Amendment.
Defendant, however, relies on the decisions of the United State Supreme Court in United States v Jones (565 US —, 132 S Ct 945 [2012]) and the New York Court of Appeals in People v Weaver (12 NY3d 433 [2009]) to support his contention that the pinging of his cell phone constituted an unreasonable search in violation of his rights under the Fourth Amendment. Neither of those cases, however, involved the pinging of a cell phone. Both involved the physical installation or attachment of GPS tracking devices on vehicles to track or monitor vehicles for extended periods of time. In both cases, it was held that those actions constituted a search under the Fourth Amendment, requiring a warrant.
In Jones, the Supreme Court held that the attachment of the GPS device to monitor the vehicle’s movements constituted a search of the suspect’s “effect” under the Fourth Amendment, requiring a warrant. The Court applied traditional Fourth Amendment jurisprudence tied to common-law trespass to find that the government’s physical intrusion constituted a search. The Court stated “[i]t is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information” and the *613 Court had “no doubt that such a physical intrusion would have been considered a ‘search’ within the meaning of the Fourth Amendment when it was adopted” (565 US at —, 132 S Ct 945 at 949). The Court further stated, however, that “situations involving merely the transmission of electronic signals without trespass would remain subject to the Katz analysis” (565 US at —, 132 S Ct 945 at 953; Katz, 389 US at 361). Under Katz, a Fourth Amendment search occurs whenever a suspect’s reasonable expectation of privacy is violated (389 US at 360). The resolution involves a two-step process. The first inquiry is whether the individual has shown that “he seeks to preserve [something] as private” (id. at 351). The second inquiry is whether “the individual’s expectation, viewed objectively, is ‘justifiable’ under the circumstances” (Smith v Maryland, 442 US 735, 740 [1979]) and in determining whether an expectation of privacy is reasonable, one must look to “a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society” (see Minnesota v Carter, 525 US 83, 88 [1998], quoting Rakas v Illinois, 439 US 128, 143 n 12 [1998]; see also Smith v Maryland, 442 US 735 [1979]).
The Jones Court also made reference to two post-Kate cases involving challenges to “beepers,” i.e., electronic tracking devices that represented another form of electronic monitoring. In United States v Knotts (460 US 276 [1983]), the police were concerned that an individual was buying chloroform to produce drugs. With the consent of the company who sold the chloroform, they placed a beeper inside the drum before defendant took possession of it. Defendant purchased it and drove it to his home by car. The Court held that the movements of the car, and its destination were open to public view and therefore not within the protection of the Fourth Amendment.
In the second beeper case, United States v Karo (468 US 705, 713 [1984]), the police planted a beeper in a container of ether that they believed was being purchased to extract cocaine from clothing smuggled into the country. The beeper was installed in the container with the owner’s consent and before it came into defendant’s possession. The Court held that the installation of the beeper did not constitute a search and seizure implicating defendant’s privacy rights even though he had no knowledge of its presence.
Clearly, the Jones case does not address the issue before this court nor does it offer support for defendant’s position. While *614 the decision significantly limits the ability of law enforcement to attach or install GPS devices to track a defendant’s movements, especially for a lengthy period of time, without first obtaining a warrant supported by probable cause, it does not address gathering information from other sources such as GPS devices that have already been installed in a car or a cell phone with the owner’s consent or knowledge. Only the concurring opinion of Justice Alito makes reference to emerging technology. Justice Alito noted the increasing availability and use of cell phones, smart phones and other wireless devices that allow wireless carriers to track and record their location and allow them to offer phone-location-tracking services as social tools. He stated that these and other new devices will undoubtedly shape the average person’s expectations about the privacy of his or her daily movements. He observed that “[n]ew technology may provide increased convenience or security at the expense of privacy, and many people may find the tradeoff worthwhile. And even if the public does not welcome the diminution of privacy that new technology entails, they may eventually reconcile themselves to this development as inevitable.” (United States v Jones, 565 US at —, 132 S Ct at 962.) Looking back at older technology, we can see how the diminution of privacy has evolved.
In Smith v Maryland (442 US at 742-743), decided in 1979, the Supreme Court held that the installation of a pen register was not a search within the Fourth Amendment. It noted that while most people may be oblivious to a pen register’s esoteric functions, they presumably understand that one common use is to aid in the identification of individuals making annoying or obscene phone calls; to that end, the Court stated that while subjective expectations of privacy cannot be scientifically gauged, it is too much to believe that telephone subscribers harbor any general expectation of privacy that the numbers they dial will remain secret. The Court observed that all telephone users realize that they must “convey” phone numbers to their telephone company, since it is through the company switching equipment that telephone calls are completed. The Court further observed that all subscribers also realize that the telephone carrier has facilities for making permanent records of all numbers dialed, because their monthly bills contain a list of their long-distance toll calls. Thus, the Court concluded that, even if a defendant harbored some subjective expectation that the phone numbers he dialed would remain private, his expecta *615 tion was not one, under the Katz analysis, that society was prepared to recognize as reasonable. The Court also noted that it is well settled that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties and that by making a phone call, he had to convey the number to the phone company if he wished to complete his call (id.). Thus, while a person may have calculated that the contents of his conversation would remain private, no one could rationally think that the number dialed would remain private (id.).
Analogous here, more than 30 years later, this court concludes, similarly, that a subscriber’s signal (the transmission of it), necessary to make a call from his cell phone, does not entitle the subscriber to a reasonable expectation of privacy.
State courts of other states have also addressed the issue or similar issues. In Devega v State (286 Ga 448, 689 SE2d 293 [2010]), which was decided before the Supreme Court decided Jones, Georgia’s highest court rejected a claim by a defendant that his lawyer was ineffective for failing to challenge the warrantless ping of defendant’s cell phone as a violation of defendant’s Fourth Amendment rights. The court applied the Knotts analysis and stated that “[t]he GPS tracking device [and ‘ping’ information] in the case at bar is simply the next generation of tracking science and technology from the radio transmitter ‘beeper’ in Knotts.” The court held that the warrantless monitoring of the defendant’s cell phone location revealed the same information as visual surveillance so there was no Fourth Amendment violation. Courts in two other states have also found no constitutional violations in similar cases (accord State v Earls, 420 NJ Super 583, 22 A3d 114 [App Div 2011], cert granted 209 NJ 97 [2011]; Stone v State, 178 Md App 428, 941 A2d 1238 [Ct App 2008]).
This court concludes that defendant’s Fourth Amendment rights were not implicated or violated by the pinging of defendant’s phone. The pinging informed the police of the vicinity of the phone on Zimbrich Street between Remington Street and Joseph Avenue. Investigator Lucci recalled that 15 Zimbrich Street was the address of one of the individuals viewed in the store surveillance video. Using good investigative skills, she then directed police officers to monitor that address until she and other investigators arrived. When the officers observed a vehicle leave that address, it was followed and intercepted. One of the occupants, the daughter of the woman who lived in the home, accompanied the investigators back to the home and gave *616 them permission to search it. By calling the number of defendant’s cell — information the investigators already had verified from two individuals — the phone was located inside a backpack on the front porch of 15 Zimbrich Street. Thus, the cell phone ping information, like the GPS tracking information and beeper information in Knotts, served to narrow the area of the space in which to look for the phone. Permission to search the residence at 15 Zimbrich was thereafter obtained from an individual with presumptive or apparent authority to give it (see People v Adams, 53 NY2d 1 [1981]; see also Illinois v Rodriguez, 497 US 177 [1990]). Inside the home under a cot on the front porch the investigators found the cell phone inside a backpack.
Moreover, searches that are conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule (see Davis v United States, 564 US —, 131 S Ct 2419 [2011]). Given the unsettled state of federal decisional law in this area, this court also concludes the investigators here acted with an objectively reasonable and good faith basis that their conduct was lawful.
Therefore, for the reasons set forth above, the pinging of defendant’s cell phone did not implicate or violate his Fourth Amendment rights.
C. New York Constitution and “Pinging”
Defendant also asserts that the pinging violated his rights under the New York Constitution, article I, § 12. The language of the state constitutional provision conforms to that of the Fourth Amendment of the United States Constitution (see People v Reynolds, 71 NY2d 552, 557 [1988]). Both guarantee against “unreasonable searches and seizures” but principles of federalism secure to the states the right to afford its citizens greater insulation from governmental intrusion than that which is provided under the Fourth Amendment (id.). That power, however, is exercised cautiously because of the identity of the language in the two clauses in both federal and state courts (id.). The threshold for the New York Constitution is the reasonable expectation of privacy in the place or object of the search (id.). The Court of Appeals has instructed that courts analyzing a given investigative procedure under our State Constitution should “focus on whether there has been an intrusion into an area where an individual has a reasonable expectation of privacy” (People v Dunn, 77 NY2d 19, 25 [1990], cert denied 501 US 1219 [1991]).
Defendant relies on the Weaver decision (12 NY3d 433) to support his position that the pinging violated his rights under *617 article I, § 12 of the State Constitution. In Weaver, the Court of Appeals concluded, that the physical placement by police of a GPS tracking device inside the bumper of defendant’s street-parked van and the constant monitoring for more than two continuous months, without a warrant or justification under any exception to the warrant requirement, constituted a search in violation of the New York State Constitution. The Court held that “[u]nder our State Constitution, in the absence of exigent circumstances, the installation and use of a GPS device to monitor an individual’s whereabouts requires a warrant supported by probable cause” (id. at 447).
Chief Judge Lippman, writing for the majority in Weaver, observed that
“[w]ith the addition of new GPS satellites, the technology is rapidly improving so that any person or object, such as a car, may be tracked with uncanny accuracy to virtually any interior or exterior location, at any time and regardless of atmospheric conditions. Constant, relentless tracking of anything is now not merely possible but entirely practicable . . . GPS is not a mere enhancement of human sensory capacity, it facilitates a new technological perception of the world in which the situation of any object may be followed and exhaustively recorded over, in most cases, a practically unlimited period. The potential for a similar capture of information or ‘seeing’ by law enforcement would require, at a minimum, millions of additional police officers and cameras on every street lamp” (People v Weaver, 12 NY3d at 441).
He noted that
“with GPS becoming an increasingly routine feature in cars and cell phones, it will be possible to tell from the technology with ever increasing precision who we are and are not with, when we are and are not with them, and what we do and do not carry on our persons — to mention just a few of the highly feasible empirical configurations” (id. at 442).
He concluded that
“the great popularity of GPS technology for its many useful applications may not be taken simply as a massive, undifferentiated concession of personal privacy to agents of the state. Indeed, contemporary technology projects our private activities into public *618 space as never before. . . . It is fair to say . . . that this change in venue has not been accompanied by any dramatic diminution in the socially reasonable expectation that our communications and transactions will remain to a large extent private. Here, particularly, where there was no voluntary utilization of the tracking technology, and the technology was surreptitiously installed, there exists no basis to find an expectation of privacy so diminished as to render constitutional concerns de minimis” (id. at 442-443).
There can be no doubt that the language of the Weaver case highlights the issues that advances in technology present for the courts. However, there, the technology was “surreptitiously installed,” whereas here, this court concludes that there was a “voluntary utilization” of the tracking technology by defendant when he had his cell phone powered on. The cell phone here was not surreptitiously attached to a unwitting individual. Moreover, public ignorance about cell phone technology can no longer be maintained in this day and age — cell phones are voluntarily carried by their users and may be turned on or off at will. People are not so oblivious that they are not aware that cell phones purchased today come with GPS technology which can pinpoint the location of the phone at any given time so long as it is turned on and the GPS technology has not been deactivated or disabled. That technology also enables a person to be mobile and have constant access to and use of his cell phone. By a person’s voluntary utilization, through GPS technology, of a cell phone, a person necessarily has no reasonable expectation of privacy with respect to the phone’s location— vis-á-vis the pinging — even though he maintains what may be a reasonable expectation of privacy in the content of his phone conversations.
Therefore, the pinging of defendant’s cell phone does not implicate or violate defendant’s rights under the New York State Constitution.